## In re Ah Kee.

(*District Court, S. D. New York.* November 25, 1884.)

HABEAS CORPUS—CHINESE SEAMEN—RIGHT TO LAND NOT WITHIN RESTRICTION ACT—ACT OF JULY 5, 1884—CONSTRUCTION.

> Ah Kee, a Chinaman, but a born subject of Great Britain, shipped as seaman at Calcutta on an American vessel, in June, 1884, and arrived in New York, November 3d, when the crew were discharged, the master intending to ship Ah Kee on board some other vessel on a return voyage without landing. Ah Kee came on shore for the same purpose, and was thereupon arrested by the United States marshal under the restriction act of July 5, 1884, and was lodged in jail. On *habeas corpus, held,* that seamen landing temporarily only, for the purpose of procuring a chance to ship on a return voyage in the ordinary pursuit of their vocation on the high seas, are not within the act, and are not required to procure the certificate described in section 6, which, for the most part, would be impossible or impracticable for seamen, and the petitioner was, accordingly, discharged from arrest.

*Habeas Corpus.*

*James P. Davenport,* for petitioner.

*Elihu Root* and *H. N. Tifft,* for the United States.

BROWN, J. The petitioner, Ah Kee, being in jail in the custody of the United States marshal of this district, has been brought before me upon *habeas corpus.* By the agreed statement of facts it appears that the petitioner is of Chinese race, language, and color; that he was born on the island of Hong Kong after its cession to Great Britian, and has always been a British subject; that for several years last past he has been a sailor, following the high seas, and usually shipping as cook; that in June, 1884, he was shipped as cook at Calcutta by Captain Thorndike on board the bark Richard Parsons, bound to New York, where she arrived on November 3, 1884; that the crew were there discharged; that the master intended that the petitioner should remain on board his ship until he found a chance to ship as sailor on a return voyage, but that a few days after the bark's arrival Ah Kee came ashore without the knowledge or consent of the master; that he was thereupon arrested by the United States marshal, on a warrant issued by the United States commissioner, on complaint of the master, and after examination remanded to the custody of the marshal to be sent back to the country from whence he came; that the petitioner has no certificate under section 6 of the act of July 5, 1884; and that his intention and purpose are to obtain, as soon as possible, a position as ship's cook on a vessel sailing for a foreign port.

This case is, in most of its features, identical with that of *In re Moncan,* 14 FED. REP. 44. The persons were there released by DEADY, J., because—*First,* "they were simply on board of a vessel touching while on a voyage to a foreign port; *second,* they were here only as members of a crew of a vessel arriving in a foreign port, and taking on cargo for another," with some further reasons in the *Case of Mon-*

*can.* See, also, *In re Ho King,* 14 FED. REP. 724. I concur entirely in the reasons and conclusions stated in the opinion of DEADY, J., in that case. They seem to me decisive of this. The expressed object of the act of May 6, 1882, (22 St. at Large, p. 58, c. 126,) is to suspend for 10 years the coming of Chinese laborers to the United States. The title of the act is "An act to execute certain treaty stipulations relating to Chinese." By article 1 of the treaty of 1880, (22 St. at Large, 826,) it is provided that "the limitation or suspension shall be reasonable, and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations." The persons prohibited by the act from coming within the United States are throughout described by the phrase "Chinese laborers." The well-known use and meaning of this phrase, and contemporaneous history, leave no doubt in my mind that the words "Chinese laborers" have no reference to seamen in the ordinary pursuit of their vocation on the high seas, who may touch upon our shores, and may land temporarily for the purpose only of obtaining a chance to ship for some other foreign voyage as soon as possible, and who do not intend to make any stay here, or enter upon any of the occupations on land within this country. Such persons do not come "to the United States as laborers;" *i. e.,* as laborers within the United States, in the sense of the act, and hence "are not included in the limitations."

Besides the general considerations above stated, there are particular provisions of the statute from which the exclusion of sailors, as being outside the intention of the statute, is to be inferred. By section 8 the master of any vessel arriving in the United States from any foreign port is required "to deliver and report to the collector of customs a separate list of all Chinese passengers taken on board his vessel at any foreign port or place, and all such passengers on board such vessel at that time," with various particulars there specified. In this section the attention of the law-makers was brought face to face with the persons who come to this country on board vessels. The law requires a detailed statement in regard to "Chinese passengers," and heavy forfeitures are denounced for violations of this section. But there is no requirement to specify any Chinese members of the crew. By section 12 of the act any Chinese person found unlawfully within the United States "shall be caused to be removed therefrom to the country from whence he came *at the cost of the United States,*" etc. Is it credible that congress intended that a seaman found here, who has landed only to ship on a return voyage in the ordinary course of his vocation, which would involve no cost or trouble to the United States, should be arrested and sent back at the cost of the government? Plainly, as it seems to me, seamen are neither within the spirit nor the letter of the act. The language of the act throughout has evidently in contemplation persons coming within the United States as laborers. It intends nothing beyond

that. The limitation of the treaty is express that the restrictions shall only apply to Chinese who may come to the United States as laborers; that is, to be laborers within the United States. Chinese seamen, therefore, who only land temporarily in the ordinary pursuit of their calling, for the purpose of shipping on a return voyage as soon as possible, are, in my judgment, wholly outside of the act.

Section 6, requiring a certificate as regards persons other than laborers who may be entitled to come within the United States, presents more difficulty. A careful attention to the details of this section, however, shows that its provisions are unadapted to Chinese seamen, whom the necessities of commerce might require to be shipped, not merely in China, but in other parts of Asia or Europe,—as in Calcutta, where this petitioner was shipped,—and that some of the requirements of this section, in respect to the certificate, would be either impossible or wholly impracticable. As I have said, since seamen do not come to the United States as laborers, they are not, as a class, included within the treaty or the intent of the act. Section 6, the general purpose of which is to ascertain the persons who may come within the United States, ought not to be so interpreted as to prevent the coming of those who are in reality entitled to come, by imposing impossible or impracticable conditions, *lex non intendit aliquid impossibile.* In *U. S.* v. *Kirby,* 7 Wall. 486, the supreme court say:

"General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

Considering, therefore, the specific purpose of the act itself, the limitations of the treaty, the impracticability of applying section 6 to Chinese seamen shipped in all parts of the world, and the clear omission of sailors from section 8, where we should naturally expect to find them specified, if intended to be referred to at all in this act, I conclude, on the whole, that they should not be deemed to be embraced within even the general words of section 6. *Chew Heong* v. *U. S.* 5 Sup. Ct. Rep. 255. Should a Chinese person, coming here and landing as a seaman, remain for any other purpose, or engage in the labor of the country, he would plainly become amenable to the provisions of the act. The petitioner in this case left the ship apparently unnecessarily. The captain intended to procure him a return voyage. He had, however, had some difficulty with the captain, and was suspicious of him, and of his intentions. The record before me states his present intention to return as soon as possible, but it does not expressly state his intention when he left the ship. As it is possible, though I think hardly probable, that he had some other intention than to ship at once on a return voyage when he came ashore, I shall order his discharge upon his own recognizance, in the sum of $500, to ship upon a voyage to some foreign port within 30 days, without

considering the effect of his shipment on board an American vessel as a British subject before the passage of the amended act of 1883. *U. S.* v. *Douglas,* 17 FED. REP. 634; *In re Ah Lung,* 18 FED. REP. 28.