YEE YEE CHUNG v. UNITED STATES.

(District Court, W. D. Texas.  June 30, 1899.)

DEPORTATION OF CHINESE—CLAIM OF UNINTENTIONAL ENTRY.

   While a court, in its discretion, on appeal, may permit a Chinese laborer arrested on the Texas side of the Rio Grande, and ordered deported by a commissioner, to return to Mexico, where he formerly resided, when satisfied of the truth of his claim that he entered the United States unintentionally, it will not interfere with the order of deportation where it appears more probable from the evidence that his entry was intentional.

W. C. McGown and Wyndham Kemp, for appellant.
Henry Terrell, U. S. Atty., and A. G. Foster, Asst. U. S. Atty.

   MAXEY, District Judge.  This cause is on appeal from the decision of the United States commissioner at El Paso ordering the deportation of Yee Yee Chung to China.  It is admitted by the appellant that he is a Chinese laborer.  The purpose of congress, as manifested by the various Chinese exclusion acts, was to effectually prevent the entrance of Chinese laborers into this country.  In the case of Wan Shing v. U. S., 140 U. S. 428, 11 Sup. Ct. 731, decided in 1891, it was said by the supreme court:

   "The result of the legislation respecting the Chinese would seem to be this: That no laborers of that race shall hereafter be permitted to enter the United States, or even to return after having departed from the country, though they may have previously resided therein and have left with a view of returning, and that all other persons of that race, except those connected with the diplomatic service, must produce a certificate from the authorities of the Chinese government, or of such other foreign government as they may at the time be subjects of, showing that they are not laborers, and have the permission of that government to enter the United States, which certificate is to be viséd by a representative of the government of the United States."

   It is true that, since Wan Shing v. U. S. was decided, our government has entered into a convention with China (ratified by the president August 22, 1894, and proclaimed December 8, 1894), by the terms of which registered Chinese laborers may, under certain prescribed conditions, return to China and re-enter the United States.  But the provisions of that treaty are inapplicable to this case, as the testimony clearly shows that the appellant has never been a resident of the United States, and he is therefore not embraced within the excepted class of laborers who may return to this country.  The question here is one of intention on the part of the appellant, who crossed the Rio Grande river from Juarez, Mexico, to the American side, and who was arrested by an inspector of customs at the guard house near the river in the city of El Paso.  It is contended by his counsel that the appellant, while seeking a friend in Juarez, Mexico, which is just across the river from El Paso, Texas, lost his way in the darkness, and wandered unwittingly across the dry bed of the river to the American side, and thus being in the United States by mere accident, and without any purpose or intention of entering the country and violating its laws, he should be permitted to return to Mexico.  If the premise of counsel be admitted, it would seem, from a consideration of several adjudged cases, that the court would have

the discretion to permit his return to Mexico. In re Ah Kee, 22 Fed. 519; In re Moncan, 14 Fed. 44. But does the testimony, when fairly considered, bear the interpretation placed upon it by counsel? It appears that the appellant and a companion, Yee Hung Pon, arrived at Juarez, Mexico (formerly Paso del Norte), from Torreon, Mexico, on a train of the Mexican Central Railway Company, about 7 o'clock on the evening of May 30, 1899. The avowed purpose of the appellant was to visit his friend Ah Som, at Juarez. His story, as told in his own words, is as follows:

"That he had arrived about 7 o'clock in the evening, in company with Yee Hung Pon, at Paso del Norte, from Torreon, Mexico; that when the train stopped some one said it was Paso del Norte, and he was hungry, and they got off: that they got off before they reached the depot, and could not find a place to eat; that they (he and Yee Hung Pon) started out to find a Chinese friend of his, who resides in Paso del Norte; that they went easterly from the railroad, and, while hunting for his house, night overtook them, and they became lost; that they wandered up and down, and finally came to the railroad track, and followed it one way and then another; that he did not know when he crossed the river, or that he was within the United States; that he did not intend to enter the United States, nor was he trying to do so; that when he was arrested he was trying to get back to Paso del Norte; that he is a Chinese laborer, and had been in Torreon, Mexico, about a year, having formerly gone to Mexico, in bond, through the United States."

On cross-examination he testified:

"My friend's name is Ah Som. I do not know where he lives in Paso del Norte. I had met a friend who told me Ah Som lived in Paso del Norte. I do not know what business Ah Som is in. I knew Ah Som at Torreon, but did not know what his occupation was there,—only knew that he was my friend. We got off the train when it stopped, before it got to the depot. We got off the train there because I was hungry. Did not get anything to eat there. It was not dark when we got off the train. We went along, looking at the houses, but could not find my friend. Yee Hung Pon speaks English. I know some words in English, but don't know any Spanish. Neither of us asked any one where Ah Som lived. We did not meet any Chinamen, and asked no one any questions. There were only we two Chinamen on the train that day. We walked through town, and on into the country, where there were bushes. We did not go back where the houses were. We got lost. I do not know what railroad I traveled on through the United States, or whether we passed through El Paso. I did not stop off at Chihuahua, coming up from Torreon, but came straight through. I did not find any work to do at Torreon, and came up to Paso del Norte."

Richard Rule, who was a special agent of the treasury department, and whose duty it was to examine trains arriving at Juarez from the interior of Mexico, testified that on the evening of May 30th he was at the railway station in Juarez when the train arrived; that 13 Chinamen got off the train, and among them he recognized the appellant's companion, Yee Hung Pon; that he did not recognize the appellant; and that the appellant was not a passenger on the train of May 28th or 29th. He further testified that on the evenings of May 28th, 29th, and 30th, there were Chinamen at the railway station in Juarez who met the train on its arrival.

The appellant presumably arrived at Juarez on May 28th, 29th, or 30th, and, in the judgment of the court, he reached there on the evening of the 30th. Having arrived at Juarez, if his real purpose was to visit his friend, Ah Som, why did he not consult some of his

95 F.—28

countrymen, who were present on the arrival of the train, as to the home or whereabouts of his friend? And, more remarkable still, although Yee Hung Pon spoke English, they proceeded through the town of Juarez, asking no questions and making no inquiries as to the location of Ah Som's residence, and finally wandered into the bushes and became lost. It appears also, that, notwithstanding their ignorance of the town and the darkness of the night, they discovered, by some inscrutable means, not disclosed by the record, the narrow trail which extended across the dry bed of the river from the Mexican to the American side, and, following the trail, they crossed over to El Paso, and were arrested by an inspector of customs at the guard house near the river about the hour of 11 o'clock. The distance is short between the Mexican Central Railway station in Juarez and the guard house on the American side of the river. According to the testimony, four hours was the time occupied by the appellant in covering that distance. It is evident from statements made by the two Chinamen to Inspector Briggs that he thought they were lost when he arrested them, and he was impressed with the belief that they were endeavoring at that time to find their way to Juarez. The story, as related by the appellant, appears altogether improbable. He seemed to know but little of his friend, Ah Som, and knew nothing of the business in which he was engaged. If Ah Som was a real person, and not a myth, the appellant could easily have shown that fact by the testimony of persons residing in Juarez, but upon that point the record is strangely silent. Judging the defendant by his acts and conduct after leaving the train at Juarez, the conviction is irresistible that his purpose was to enter the United States in direct violation of the Chinese exclusion acts, and that he sought the darkness of night to more effectually accomplish his object. The order of the commissioner is sustained by the evidence, and it will therefore be affirmed. Ordered accordingly.