## Case No. 14,823.

### UNITED STATES v. COFFIN.

[Bee, 140.] [1]

District Court, D. South Carolina. May 10, 1799.

#### DEED—SEAL—WHAT SUFFICIENT.

A mark with ink, acknowledged by the maker of a deed to be his seal is sufficient to create a specialty, though no wax, wafer, or other similar substance be used.

This was an action of debt on a customhouse bond. An exception was taken to the validity of the seal which was in the following form

(L. S.)

No wax or wafer had been used; but the bond had been duly delivered, and that mark acknowledged by the obligor to be his seal.

It was contended for the defendant [Ebenezer Coffin] that as the ground of action was an obligation declared to be under the hand and seal of the party, and as the profert did not support this, debt would not lie, and the plaintiff ought to be nonsuited. That the action of debt must be founded on a special-

ty, to create which a seal was necessary. That the court would take as the seal of the party any substance on which an impression might be made; but that none such existed here. That if the reason of the law requiring a seal had ceased, the mode, perhaps, ought also to be done away; but that the power of dispensing with it rested with the legislature, and not with the judges, who must take the law as they find it. 2 Comyn, 635, 637; Esp. 96; Co. Litt. 35–37; Dyer, 13.

## Case No. 14,824.

### UNITED STATES v. COFFIN.

[1 Sumn. 394.] [1]

Circuit Court, D. Massachusetts. May Term, 1833.

#### SEAMEN—INDICTMENT FOR MALICIOUSLY FORCING ON SHORE—JUSTIFIABLE CAUSE.

Indictment for maliciously and without justifiable cause forcing a seaman on shore, in a foreign port, against the crimes act of 1825, c. 276, § 10 [3 Story's Laws, 1999; 4 Stat. 115]. "Maliciously," in the statute means wilfully, against a knowledge of duty. "Justifiable cause" does not mean such a cause, as in the mere maritime law might authorize a discharge; but such a cause, as the known policy of the American laws on this subject contemplates, as a case of moral necessity, for the safety of the ship and crew, or the due performance of the voyage.

[Cited in U. S. v. Taylor, Case No. 16,442; Wiggin v. Coffin, Id. 17,624; Re Ah Tie, 13 Fed. 293.]

Indictment [against Thaddeus Coffin] for maliciously, and without justifiable cause, forcing a seaman of the ship Fabius on shore in a foreign port, to wit, at the Sandwich Islands, contrary to the crimes act of 1825, c. 276, § 10 [3 Story's Laws, 1999; 4 Stat. 115]. Plea, general issue, not guilty.

Mr. Dunlap, U. S. Dist. Atty.
Mr. Bartlett, for defendant.

STORY, Circuit Justice, in summing up to the jury, said: In this case, it is admitted, that the ship Fabius is an American ship, and Frederick Daniels was one of her crew, and the steward of the ship on a whaling voyage to the Pacific. It is also admitted, and indeed is proved beyond all controversy, that he (Daniels) was forced ashore by the direct orders and instrumentality of the master, at the port of Mahee, in one of the Sandwich Islands, against his will, and landed on the beach there with his chest, without any means of subsistence, for the purpose of finally separating him from the ship for the voyage. He (Daniels) is by birth a Dane, and (it is said) has been naturalized; but

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

[1] [Reported by Charles Sumner, Esq.]

that fact is not proved by the proper record evidence. Under these circumstances, it is contended, in the first place, that by the act of 1813, c. 184 [2 Story's Laws, 1302; 2 Stat. 809, c. 42], foreign seamen cannot be lawfully employed as part of the crew of an American ship; and in the next place, if they can, that the act of 1825, c. 276, § 10 [3 Story's Laws, 1999; 4 Stat. 115], on which the present indictment is founded, applies only to seamen in American ships, who are citizens. My opinion is, that the argument is not well founded in either respect. The act of 1813, c. 184 [2 Story's Laws, 1302; 2 Stat. 809, c. 42], declares, indeed, that after the then war with Great Britain, it shall not be lawful to employ on board of any public or private vessels of the United States any persons, except citizens. But the tenth section of the same act suspends the operation of the act, as to the employment of seamen, who are subjects of any foreign nation, which shall not by special treaty with the United States have prohibited the employment on board of her public or private ships of white citizens of the United States. Denmark has made no such treaty stipulation; and, therefore, the clause, as to subjects of that country at least, remains inoperative.

Then, as to the act of 1825, on which the present indictment is founded, its language is general, and equally applicable to all seamen constituting a part of the crew of an American ship, whether foreigners or natives; and I can perceive no public policy, which would justify the court in construing the words as confined to the latter. So long as foreign seamen are permitted by our laws to be employed on board of American ships, they must be deemed admitted to the protection of those laws; as they are certainly responsible both civilly and criminally for any violation of them. It would be a most extraordinary predicament to hold them liable for the latter, and at the same time to deny them all benefit of the former. No such invidious distinction is at present established in our legislation. The language of the tenth section is: No master, &c., "shall during his being abroad maliciously and without justifiable cause force any officer or mariner of such ship or vessel" (not any American officer or mariner) "on shore, or leave him behind in any foreign port or place, or refuse to bring home again all such of the officers and mariners of such ship or vessel, as he carried out with him, as are in a condition to return, and willing to return, when he is ready to proceed on his homeward voyage," &c. Now, it is plain, that the home here referred to is not the particular home of any seaman, native or foreign; but the home port of the ship for the voyage.

Then, what is to be deemed a "justifiable cause" in the sense of the act? It is argued, that whatever misbehavior would, by the general principles of the maritime law, constitute a sufficient cause to discharge a seaman in a

foreign port, is a "justifiable cause" in the sense of the act. But it seems to me, that this is laying down the rule much too broadly. It is not, indeed, every offence committed by a seaman, which will, even by the maritime law, authorize the master to discharge him in a foreign port. It must be some offence of a high and aggravated character; or long and habitual disregard of duty; or other continued misconduct, unrepented of and unchanged. But the laws of the United States, from motives of an enlarged policy, have circumscribed the authority of the master, in cases of discharge, within much more narrow bounds. It is well known, that in former times the government were put to very great expenses for the relief and maintenance of sick, disabled and other seamen, who were discharged, or left abroad by masters of American ships under various pretences, often exceedingly frivolous, and sometimes from a spirit of revenge or passionate excitement. The evil became so extensive, and so burdensome, that by a statute passed in 1803—Act 1803, c. 62, § 1 [1 Story's Laws, 883; 2 Stat. 203, c. 9]—masters of ships on foreign voyages were required to give bonds with security for the due return of all the seamen who were engaged for the voyage; and by a proviso in that statute it was declared, that the bond so given should not be forfeited on account of the master's not producing any of the crew, who might be discharged in a foreign country with the consent of the American consul, or other commercial agent, in writing; nor on account of any of the crew dying, or absconding, or being forcibly impressed into another service. And another section of the act (section 3) provided for cases, when the vessel is sold, or a seaman is discharged with his own consent in a foreign country. Now, looking to the obvious policy of this act, it is impossible not to feel, that congress meant to admit no excuses under the bond, except in extreme cases, where the consul authorized the discharge, or the seaman died, or absconded, or was impressed. The present case does not fall within either of these classes of cases. But I am not prepared to say, that others may not exist, not mentioned in the statute, which yet would constitute a justifiable cause of a discharge. But I think the right to discharge seamen can result only from what may be deemed a moral necessity, analogous to the cases put in the statute. Suppose for instance, a seaman should make a revolt on board of a ship, or endeavour to make such a revolt; and should persist in his misconduct, so that his farther continuance on board would be hazardous to the master and crew, and the objects of the voyage; it seems to me, that it would constitute a good cause for a discharge. So, if a seaman should commit a manslaughter, or assault any of the officers or crew with an intent to kill, or otherwise conduct himself in such a malicious and gross manner as to render his presence on board dangerous to the crew and the safety of the

ship; the same result would follow. And I am not prepared to say, that even long continued, obstinate, and malicious disobedience of orders, or neglect of ship's duty, indicating a mutinous disposition, and deliberate intent to subvert the ship's discipline, and the government of the crew, would not equally justify a discharge; although it is not expressly within the purview of the statute. But I think the right arises only under extraordinary emergencies and in extreme cases, where otherwise the safety of the officers or crew, or the due performance of the voyage, or the regular enforcement of the ship's discipline, would be put in jeopardy. The mere convenience of the master would not justify a discharge; much less such offences, as could be ordinarily suppressed by the common punishments administered in the sea service.

But it is not sufficient, that there should be a want of justifiable cause, to bring the case within the statute. The act must be maliciously done. Now, "maliciously," in the sense of the act, is not limited to acts done from hatred, revenge, or passion; but it includes all acts wantonly done, or wilfully done, that is, against what any man of reasonable knowledge and ability must know to be contrary to his duty.[1] Now, every man is presumed to know, what the law ordinarily requires of him in point of duty; and he cannot shelter himself from liability by any pretence of ignorance of that, which, in his station, every man must be presumed to know. Still, if the circumstances are such, that a master of reasonable judgment, acting bona fide, and not from passionate excitement, might fairly deem it his duty to discharge the seaman, he will not be guilty of the offence intended by the act. Every master in a foreign voyage cannot but be presumed to know, what the obligation of the bond given by him, to bring home the crew, who go on the voyage, imports. And he cannot but know, what are the excuses allowed by the act. If he goes beyond them, he acts at his peril, and can justify himself only in a clear case of moral necessity, such as I have stated.

Let us apply these principles to the present case. That the master forced the seaman on shore at the Sandwich Islands is (as I have said) admitted. The onus probandi, then, is on the master to establish, that the act was for a justifiable cause; for in the absence of such cause the law will presume, that he did it maliciously, until the contrary is proved. The defence is here mainly rested on the fact, that after the seaman (who was steward of the ship) was tied up to the rigging, and flogged with a cat-of-nine-tails, he never did

any duty, until he was discharged; that is, from June to November, 1831; and that this arose from his wanton obstinacy and malice, and determination not to do duty, and not from inability. The answer on the other side is, that the flogging produced a rupture or hernia in the abdomen; and that the seaman was thus rendered wholly incapable of performing duty, and was really, not pretendedly, an invalid. Which of these statements is true? (Here the judge recapitulated the evidence.) If the jury believe, that the seaman was not injured, as he pretended, by the flogging; but was able to do duty, and obstinately and maliciously refused to do duty, in order to revenge himself, and to destroy the ship's discipline, and to incite others of the crew to disobedience, then the defendant ought to be acquitted. If he was in fact disabled; and the master by reasonable inquiries might have ascertained it; and he chose to act upon his feelings of disgust with the seaman; or rashly upon his own suspicion; then it seems to me, that he ought to be found guilty.

Verdict guilty. Judgment accordingly.

---

[1] See U. S. v. Ruggles [Case No. 16.205]; Philp's Case, 1 Moody. Cr. Cas. 264. 273; Bromage v. Prosser, 4 Barn. & C. 247. 255; Dexter v. Spear [Case No. 3.867]. "Wilful and malicious trespass," for the meaning of these words in a statute, 3 Bl. Comm. 214. See, also, Rex v. Harpur, 1 Dowl. & R. 222; Duncan v. Thwaites. 3 Barn. & C. 556; Pattison v. Jones, 8 Barn. & C. 578.

