CASE OF THE CHINESE LABORERS ON SHIPBOARD.

---

## CASE OF THE CHINESE LABORERS ON SHIPBOARD.

### *In re* AH TIE and others.

(*Circuit Court, D. California.* August 29, 1882.)

**1. CHINESE LABORERS—IMMIGRATION—PROHIBITION.**

The prohibition upon the master of a vessel, contained in the act of congress restraining the immigration of Chinese laborers, from bringing within the United States, from any foreign port or place, any Chinese laborer, was intended to prevent the importation of such laborers from the foreign port or place,—laborers who there embarked on the vessel,—and does not apply to bringing a Chinese laborer already on board his vessel when touching at a foreign port or place.

*Matter of Ah Sing, ante,* 286, affirmed.

**2. SEAMEN—ON AMERICAN VESSEL.**

While on board an American vessel a Chinese laborer is within the jurisdiction of the United States, and does not lose by his employment the right of residence here previously acquired under the treaty with China.

*Matter of Ah Sing, ante,* 286, affirmed.

**3. SAME—NOT CHANGED BY TEMPORARY ABSENCE.**

The *status* of a person employed on an American vessel is not changed by the fact that he is permitted by the captain to land for a few hours at a foreign port or place, and a Chinese laborer on an American vessel cannot be held to lose his residence here, so as to come within the purview of the prohibitory act of congress, by a temporary entry upon a foreign country.

**4. STATUTORY CONSTRUCTION.**

All laws should be so construed, if possible, as to avoid an unjust or an absurd conclusion.

*McAllister & Bergin,* for petitioners.

*Milton Andros,* for the captain.

Before FIELD, Justice, and SAWYER, C. J.

FIELD, Justice. The petitioners are part of the crew of the American steam-ship City of Sydney. Their case is substantially like that of Ah Sing, the Chinese cabin waiter of the same vessel, recently before us on *habeas corpus.*[1] It differs in only one particular. Like him, they are Chinese, and like him they shipped on board of the steam-ship on the fifth of May last, signing at the time articles binding themselves to go as part of its crew on a voyage from San Francisco to Sydney and back. One of the petitioners served on board as a scullion; the others, as waiters or pantrymen. The vessel departed from this port on the eighth of May, arrived at Sydney on the fourth of June, left Sydney on the fourteenth of July, and arrived here on the eighth inst., having touched at the ports of Auckland, in New Zealand, and Honolulu, in the Hawaiian Islands. At Sydney the petitioners, on several occasions, by the written permission of the captain, went on shore and remained a few hours, without, however, severing or intending to sever their connection with the vessel as part of its crew. This fact is the only one distinguishing this case from that of Ah Sing. We there held that the prohibition upon the master of a vessel, contained in the act of congress, to bring within the United States from a foreign port or place any Chinese laborer, was intended to prevent the importation of such laborers from the foreign port or place,—laborers who there embarked on the vessel,—and did not apply to his bringing a Chinese laborer already on board of his vessel touching at the foreign port. We also held that while on board the American vessel the laborer was within the jurisdiction of the United States, and does not lose, by his employment, the right of residence here previously acquired under the treaty with his country.

The *status* of the petitioners and their relation to the vessel were not changed in any respect by the fact that they were permitted by

[1] Ante, p. 286.

the captain to land for a few hours at the port of Sydney. They were bound, by their contract of shipment, to return with the vessel; and the captain was bound to bring them back. He could not have forced them ashore in a foreign port; nor could he have abandoned them there. Had he done either of these things, he would have rendered himself liable to criminal prosecution. An act of congress passed more than half a century ago, and re-enacted in the Revised Statutes, declares that "every master or commander of any vessel, belonging in whole or in part to any citizen of the United States, who, during his being abroad, maliciously, and without justifiable cause, forces any officer or mariner of such vessel on shore in order to leave him behind in any foreign port or place, or refuses to bring home again all such officers and mariners of such vessel whom he carried out with him, as are in a condition to return and willing to return when he is ready to proceed on his homeward voyage, shall be punished" by fine and imprisonment. The fine may extend to $500, and the imprisonment to six months. Rev. St. § 5363. The terms "officers and mariners," here used, apply to all persons, other than the captain, employed under shipping articles on the vessel in any capacity.

In *U. S.* v. *Coffin*, 1 Sumn. 394, Judge Story was called upon to construe this act, and he held that the "home" referred to was not the home of any seaman, native or foreign, but the home port of the ship for the voyage.

In another case (*Matthews* v. *Offley*, 3 Sumn. 125) the same distinguished judge had occasion to consider the circumstances under which a foreign seaman, who had acquired a residence in the United States, and had been engaged in the merchant service, could be deemed to have abandoned that service, so as to justify the captain of another vessel in refusing to bring him home from a foreign port as a destitute seaman, by direction of the consul; and the judge said that some overt act on the seaman's part, such as engaging in a foreign service, or resuming his original native character, or disowning his American character and domicile, seemed indispensable to rebut the presumption that he still attached himself to the American service. Something equally indicative of an intention on the part of a Chinese laborer who had shipped on an American vessel as one of its crew in an American port, to abandon the service of the ship and his residence in the United States, would seem to be necessary to justify the master in refusing to bring him back. The

law of congress as to the duty of the master in this particular has not been, in terms, repealed by the act restraining the immigration of Chinese laborers, and the purpose of the latter act does not require us to hold that the former is repealed by implication. A Chinese laborer on an American vessel cannot be held to lose his residence here, so as to come within the purview of the act, by such temporary entry upon a foreign country as may be caused by the arrival of the vessel on her outward voyage at her port of destination, or her touching at any intermediate port in going or returning, or her putting into a foreign port in stress of weather. And we should hesitate to say that it would be lost by the laborer passing through a foreign country in going to different parts of the United States by any of the direct routes, though we are told by the counsel of the respondent that a Chinese laborer, having taken a ticket by the overland railroad from this place to New York, by the Central Michigan 'route, which passes from Detroit to Niagara Falls through Canada, was stopped at Niagara and sent back, as within the prohibition of the act of congress, and on his attempting to retrace his steps was again stopped at Detroit. A construction which would justify such a proceeding cannot fail to bring odium upon the act, and invite efforts for its repeal. The wisdom of its enactment will be better vindicated by a construction less repellant to our sense of justice and right.

All laws should be so construed, if possible, as to avoid an unjust or an absurd conclusion. "General terms," said the supreme court, in a case before it, "should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law, in such cases, should prevail over its letter." *U. S.* v. *Kirby,* 7 Wall. 482. So the judges of England construed the law which enacted that a prisoner breaking prison should be deemed guilty of a felony, holding that it did not apply to one breaking out when the prison was on fire, observing that the prisoner was "not to be hanged because he would not stay to be burnt." And in illustration of this doctrine the construction given to the Bolognian law against drawing blood in the street is often cited. That law enacted that whoever thus drew blood should be punished with the utmost severity, but the courts held that it did not extend to the surgeon who opened the vein of a person falling down in the street in

a fit. The application sought to be made of that law to the surgeon was hardly less absurd than some of the applications which, without much reflection, are sought to be made of the act of congress.

The petitioners must be discharged. Ordered accordingly.