### LEE KAN v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 21, 1894.)

CHINESE—EXCLUSION—"MCCREARY ACT" DEFINING "MERCHANTS."

To except a Chinaman from the operation of the "Geary Act," as a merchant within the definition of section 2 of the "McCreary Act," his interest must be real, and appear in the business and partnership articles in his own name. It is not necessary that his name appear in the firm designation.

Appeal from the District Court of the United States for the Northern District of California.

This was a petition by Lee Kan for a writ of habeas corpus. The district court remanded the petitioner, and he appealed.

Thomas D. Riordan, Lyman I. Mowry, and Henry C. Dibble, for appellant.

Charles A. Garter, for the United States.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

McKENNA, Circuit Judge. This is an appeal from a judgment of the district court for the northern district of California, rendered in proceedings on habeas corpus, appellant being petitioner, adjudging him to be a person forbidden by law to land in the United States, and remanding him to the custody of the ship Oceanic in San Francisco harbor, and to the custody of the United States marshal, until the order be executed. The facts as stipulated by counsel are substantially as follows: That appellant is a native of China, and came to reside in the United States in November, 1880, and continuously resided in San Francisco from that time until November, 1893, engaged in mercantile pursuits. In 1887 he became a member of the Chinese firm of Wing Tai Lung (sometimes called Wing Lung & Co., for the purpose of following the American custom), wholesale importers of Chinese merchandise. That his interest amounts to $1,000, and that his interest stood and stands in his own name. That his firm is composed of eight partners, having a total of $8,500, and did business at 417 Commercial street, in San Francisco, a fixed place, buying and selling merchandise for a period of more than two years continuously prior to the 2d of November, 1893; and that petitioner can establish by the testimony of two credible white witnesses that he conducted such business at such place for more than one year prior to his departure from the United States, and did not engage in the performance of any manual labor except such as was necessary in the conduct of his business. That the name Wing Tai Lung is not the name of any person, nor does it contain the name of any person whatever, but is a mere fanciful designation used as a means of convenience, and for trading purposes, and in accordance with the custom of the Chinese race. That the name of petitioner appears in the articles of copartnership and partnership accounts, and on the verified list of partners filed in the custom house September 9, 1893, the latter being a list filed at the request of the collector as a precaution against imposition on the law.

The petitioner is undoubtedly a merchant in fact, and the question presented is, is he one within the definition of the character contained in section 2 of the "McCreary Act," so called, which is as follows:

"Sec. 2. * * * The term merchant as employed herein and in the acts of which this is amendatory, shall have the following meaning, and none other: A merchant is a person engaged in buying and selling merchandise in a fixed place of business, which business is conducted in his own name, and who, during the time he claims to be engaged as a merchant, does not engage in the performance of any manual labor, except such as is necessary in the conduct of his business as such merchant. When an application is made by a Chinaman for entrance into the United States on the ground that he was formerly engaged in this country as a merchant, he shall establish

by the testimony of two credible witnesses, other than Chinese, the fact that he conducted such business as hereinbefore defined, for at least one year before his departure from the United States, and that during such year he was not engaged in the performance of any manual labor, except such as was necessary in the conduct of his business as such merchant, and in default of such proof he shall be refused landing."

The learned judge of the district court found the facts as hereinbefore stated, but held that petitioner did not conduct business in his own name, and denied him the right to land. To ascertain the meaning of congress, the purpose of the act as well as the language must be considered. The provisions of section 2, supra, are amendments to the act of May 5, 1892, commonly called the "Geary Act," and they and the act they amend are but steps in legislation to regulate and restrict the coming of Chinese laborers into the United States, and all provisions in regard to other classes are but means to that end. In interpreting that legislation, this purpose has been steadily regarded, as by well-known canons of interpretation it must have been regarded, and the general language of the acts confined to executing this purpose. In re Low Yam Chow, 13 Fed. 605. The sanction of these acts is the treaty of November, 1880, modifying that of 1868, except the Scott law, which, to its extent, abrogated the treaty; but this also was no exception to the purpose of the legislation, to wit, the exclusion of laborers. Besides, it was expressed in terms so irresistibly clear as to leave interpretation no function. The first article of the treaty of November, 1880, provides that "the government of the United States may regulate, limit, or suspend the coming or residence of Chinese laborers to the United States, but may not absolutely prohibit it;" but the treaty also provides "that the limitation or suspension shall be reasonable, and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitation." Furthermore, in the second article it is declared that "Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body or household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nations." The first act after this treaty was that of May 6, 1882. It prohibited the coming of Chinese laborers for 10 years, and contained provisions to secure the prohibition. Among others, it provided, in section 6, that the identity of "every Chinese person other than a laborer should be evidenced by a certificate issued under the authority of the Chinese government." This act came up for consideration before Justice Field in the case of In re Low Yam Chow, supra, and he held that the "section was evidently designed to facilitate proof by Chinese, other than laborers coming from China, and desiring to enter the United States. * * * It is not required as a means of restricting their coming. To hold that such was its object would be to impute to congress a purpose to disregard the stipulation of the second article of the new treaty

that they should be allowed to go and come of their own free will and accord." The learned justice also says:

"And we will not assume, in the absence of plain language to the contrary, that congress intended to disregard the obligation of the original treaty of 1868, which remains in full force except as modified by the supplementary treaty of 1880."

This case and its language were approved by the United States supreme court in Lau Ow Bew v. U. S., 144 U. S. 59, 12 Sup. Ct. 517, and other cases were there collected and commented on which sustain its principle. There is nothing in the Geary and the McCreary acts which excludes them from the doctrine of these cases, or in any way includes merchants in the limitations or prohibitions on immigration. That we are right in this case is sustained by the explanation made by Mr. Geary in the house of representatives when the McCreary bill was under consideration. The provisions of section 2, supra, were not contained in the bill reported by the committee on foreign affairs. They were moved as amendments by Mr. Geary, and in explanation of them he said:

"There is one other definition that we think necessary. The treaty permits 'merchants' to come into this country. We have no desire to restrict the movements of the mercantile class; but the trouble has been that men pretending to be merchants have asked for admission at New York and other places, have sworn that they had interest in stores established in those communities, have been admitted as merchants, and immediately developed into full-fledged laborers. We merely ask for a definition of the word 'merchant' which shall be broad enough to protect every man legitimately engaged in that industry, and narrow enough to prevent the designation being used as an instrument of fraud by a class that we do not desire. This amendment requires every Chinaman asking to be admitted into the United States, and who claims to have formerly resided here, to prove that for at least one year, at some fixed place of business within the Union, he was engaged in buying and selling merchandise. We do not demand that he shall have a dollar's worth of stock, or a thousand dollars' worth; we simply follow the language of the treaty, and demand this protection to our own people."

How efficient the amendment is for the purposes declared by Mr. Geary we shall hereafter show. It is incontestable that it was not directed at merchants any more than prior legislation was, or that it was not intended to regulate their methods of business, except so far as necessary to prevent evasions of the act. It was directed at laborers,—to prevent them from assuming a false character. To construe it otherwise is to make merchants its primary objects, and subject them to a discrimination and inconvenience within the country to which no other merchants are subjected. It would not only forbid them to do business as it is their custom to do, but to do business as it is the custom of all commercial people to do. It is stipulated in this case that the designation of the firm of which petitioner is a member was selected in accordance with a custom which has prevailed from time immemorial among the Chinese, and expresses a propitious omen, and means, when literally rendered in English, "everlasting," "great," "bountiful." But, as stated by counsel, the custom is not exclusive with Chinese. It prevails with other people, and the Bon Marche of Paris, and the Golden Rule Bazaar of this city were cited, among others, as ex-

amples. These designate, as the name Wing Tai Lung designates, a house rather than a firm, and expresses the sentiment and principle which shall govern its dealings. It might be better if the practice were more general. The construction contended for by the government would not only forbid the Chinese this practice, but forbid them, as we have said, the common practice of this country, and of all commercial countries. The designations of very few business houses contain the names of all of the partners. One or two are usually named, and the others are not named, but only their existence indicated by the addition "and Company." We cannot believe that congress intended to forbid to Chinese merchants, not only their own customs, but the custom of merchants wherever trading is practiced. But we construe section 2 to mean that the interest of the merchant must be real, and appear in the business and partnership articles in his own name, and not that his name must appear in the firm designation. And this reaches the evil which existed. It was not complained that the firm designation was a cover to deception. According to the stipulation, it could not be in many cases. It contained no name to claim. It was complained that an interest was claimed which stood in a name other than the claimant's, and that the ownership was established by Chinese testimony. Section 2 prevented this, and required name and ownership to go together, and to be established by the testimony of credible witnesses other than Chinese. This view is confirmed by considerations drawn from other sections of the act. The definition of "merchant" is general. The provision of section 2 is:

"The term merchant employed herein and in the acts of which this is amendatory shall have the following meaning, and none other."

The definition is. then given as hereinbefore stated. Section 6 requires all Chinese laborers to register, the penalty of refusal being deportation from the country. All who are not merchants within the requirements of the definition (excluding, of course, certain privileged classes) are laborers; hence the definition applies not only to the merchant who claims to enter the United States, having formerly been here, but to him who stayed and while he stays.

The interpretation of the government makes the law forbid him to stay as a merchant and do business as he formerly did, and to what end? That he may be deported? No one desires it. That he may be compelled to register as a laborer? A useless compulsion. And, to accomplish an undesired or useless result, we are asked to attribute to congress an intention to change the business methods of many people, and to compel them to adopt inconvenient and, maybe, impracticable ones. Chief Justice Fuller, delivering the opinion of the court in Lau Ow Bew v. U. S., supra, said:

"Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion."

And the learned chief justice cites Church of Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511; Henderson v. Mayor, 92 U. S. 259;.

U. S. v. Kirby, 7 Wall. 482; Oates v. Bank, 100 U. S. 239.    This is a wise canon of construction.    By it, language general enough to include other things is confined to the purpose of the lawmakers, securing it and avoiding confusion and disappointment, and often absurdity.    Illustrating this canon, Justice Field, in the Case of Ah Tie, 13 Fed. 294, said:

"So the judges of England construed the law which enacted that a prisoner breaking prison should be deemed guilty of felony, holding that it did not apply to one breaking out when the prison was on fire, observing that the prisoner was 'not to be hanged because he would not stay to be burnt.'  And, in illustration of this doctrine, the construction given to the Balognian law against drawing blood in the street is often cited.  That law enacted that whoever thus drew blood should be punished with the utmost severity, but the courts held that it did not extend to the surgeon who opened the vein of a person falling down in the streets in a fit."

And the learned justice, in Re Low Yam Chow, supra, gave two additional illustrations taken from decisions of the supreme court:

"A law of congress declares that whoever willfully obstructs or retards the carrier of the mails of the United States shall be deemed guilty of a public offense, and be punished by a fine.  A mail carrier in Kentucky was arrested by the sheriff upon a charge of murder, and for the arrest the sheriff was indicted.  The supreme court held that the general language of the act of congress was not to be construed to extend to the case; for it could not be supposed that congress intended to interfere with the enforcement of the criminal laws of the state in its legislation to prevent unnecessary obstruction in the carriage of the mails.  It would have been absurd to hold that, in order to secure the speedy transportation of the mails, immunity from punishment for a crime was given to the mail carrier.  U. S. v. Kirby, 7 Wall. 482.  So the act of congress for the recovery of the proceeds of captured and abandoned property during the late war required the claimant in the court of claims to prove that he had never given aid or comfort to the rebellion; yet the supreme court held that one who had been pardoned by the president was relieved from this requirement.  The general language of the act covered his case, but, as the pardon in legal effect blotted out the guilt of the offender,—that is, closed the eyes of the court so that it could not be considered as an element in the determination of his case,—the pardon was deemed to take the place of the proof, and relieved him from the necessity of establishing his loyalty.  'It is not to be supposed,' said the supreme court, 'that congress intended by the language of the act to encroach upon any of the prerogatives of the president, and especially that benign prerogative of mercy which lies in the pardoning power.  It is more reasonable to conclude that claimants restored to their rights of property by the pardon of the president were not in contemplation of congress in passing the act, and were not intended to be embraced by the requirement in question.  All general terms in statutes should be limited in their application so as not to lead to injustice, oppression, or any unconstitutional operation, if that be possible.  It will be presumed that exceptions were intended which would avoid results of that nature.'  Carlisle v. U. S., 16 Wall. 153."

And the learned justice said, virtually, that these cases would have justified him in restricting section 6 of the act of 1882 to merchants coming from China, even if the general term used in the section were susceptible of a larger meaning.    Undoubtedly, if the purpose of the act had been a limitation on the immigration of merchants, as it was of laborers, its language would have applied to their coming from everywhere.    There can be no temptation, in order to secure the exclusion of Chinese laborers, to give a strained construction to section 2.    As we construe it, it is entirely sufficient,

and completely fulfills the objects of the legislation. It does not disturb real merchants in the privileges guarantied by the treaty, and it prevents false ones from claiming them. It makes the definition of the word "merchant" that which Mr. Geary aptly said it was intended to be,—"broad enough to protect every man legitimately engaged in that industry, and narrow enough to prevent the designation being used as an instrument of fraud by a class that we do not desire." The burden of proof is on the person seeking to land, and the character of the facts which he must prove, the time which they must have existed, and the witnesses by whom proved, together with the possibilities of counter proof inevitably suggested, make deception impossible, except under a very negligent administration of the law. A place in the firm name would not prevent this, nor is it to be apprehended.

The construction we have given to section 2 makes it unnecessary to decide, under the facts in this case, the point made by petitioner that it does not apply to merchants who departed prior to its enactment. The judgment of the district court is reversed, and the cause remanded, with directions to discharge the petitioner.