UNITED STATES v. LEE YUNG.

(District Court, S. D. California. October 8, 1894.)

No. 652.

CHINESE LABORER — LOSS OF RESIDENCE — TEMPORARY ABSENCE FROM UNITED STATES.

A Chinese laborer, entitled to reside in and a resident of the United States, does not lose his residence by going to the Hot Springs, in Mexico, one or two miles from the boundary line, with the intention of remaining there only two or three days, for the benefit of his health, and in fact remaining there only one night.

Lee Yung was charged with unlawful entry into the United States. From an order of a United States commissioner directing him to be deported to China, he appeals. Reversed.

W. A. Sloane, for appellant.
George J. Denis, U. S. Atty.

ROSS, District Judge. This is an appeal from the judgment and order of a commissioner directing the deportation of the defendant to China. The agreed statement of facts shows that the defendant has resided in San Diego county, in this judicial district, for five or six years, and had applied for, received, and at the time of his arrest, had in his possession, his certificate of residence, issued according to law, and showing him to be a Chinese laborer, and entitled to reside in the United States; that he is the owner of a one-third interest in a Chinese store in the city of San Diego, having about $1,000 invested therein, but has not been personally engaged in the business, and is not a merchant, as contemplated by the exclusion act. He is, proceeds the agreed statement, "what is termed an 'Americanized Chinaman,' having adopted the Christian religion and American manners of dress and living, and bears a high reputation for truthfulness and reliability." The agreed statement further shows that on the afternoon of July 18, 1894, acting under the advice of his physician, who had been treating him for inflammatory rheumatism, that he should go to the country for a time, the defendant left San Diego for the purpose of spending a few days with some Chinese friends some miles back from the seacoast. These friends live in San Diego county, near a branch of the San Diego & Otay Railroad, which forms a junction with the main line running between San Diego and Tia Juana, at a point a few miles north of Tia Juana. That, on the afternoon named, the defendant took passage on the train over this road, and went through to Tia Juana, a distance of 15 miles from San Diego, with the intention of coming back to where his friends lived on the return train that evening. He had with him a hand valise, containing a change of underclothing, a collar or two, and some medicine. On reaching Tia Juana, which is situated in the United States, on the international boundary line between this country and Mexico, he heard the driver of an omnibus calling "All aboard for Hot Springs." These springs are a health resort, situated in Mexico; a mile or two below the international line, and a short distance from Tia Juana. It occurred to the defendant, proceeds the agreed statement, "that the hot baths at the springs might benefit his rheumatism, and, after making some inquiry with that purpose in view, he went to the springs, not having originally contemplated doing so, and with the intention of remaining there a short, but indefinite period, probably not exceeding two or three days. He tried the baths that evening, and the next morning returned to Tia Juana, and recrossed the line into the United States. He then boarded the train, and paid his fare to his original destination, the place where his friends lived, and was en route for there when arrested."

The agreed statement of facts further recites that the evidence shows that he was, prior to entering Mexico, at Tia Juana, on the afternoon of July 18th, lawfully entitled to reside in the United States, and that the crossing the line under the circumstances and at the time stated constituted his only departure from the United States, and his return to this country on the following morning, July 19th, was the act charged as an unlawful entry into the United States; that defendant knew he was crossing the boundary line into Mexico.

In the Case of Ah Tie, 13 Fed. 291, Mr. Justice Field, with whom concurred Judge Sawyer, held that a Chinese laborer on an American vessel cannot be held to lose his residence here, so as to come within the purview of the act of congress prohibiting the master of such vessel from bringing within the United States from a foreign port or place any Chinese laborer, by such temporary entry, upon a foreign country, as may be caused by the arrival of the vessel on her outward voyage at her port of destination, or her touching at any intermediate port in going or returning, or her putting into a foreign port in stress of weather; and we should hesitate, proceeded the learned justice, "to say that it would be lost by the laborer passing through a foreign country in going to different parts of the United States by any of the direct routes, though we are told by the counsel of the respondent that a Chinese laborer, having taken a ticket by the overland railroad from this place to New York, by the Central Michigan route, which passes from Detroit to Niagara Falls through Canada, was stopped at Niagara, and sent back, as within the prohibition of the act of congress, and, on his attempting to retrace his steps, was again stopped at Detroit. A construction which would justify such a proceeding cannot fail to bring odium upon the act, and invite efforts for its repeal. The wisdom of its enactment will be better vindicated by a construction less repellent to our sense of justice and right. All laws should be so construed, if possible, as to avoid an unjust or an absurd conclusion. 'General terms,' said the supreme court, in a case before it, 'should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always therefore be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law, in such cases, should prevail over its letter.' U. S. v. Kirby, 7 Wall. 482. So the judges of England construed the law which enacted that a prisoner breaking prison should be deemed guilty of a felony, holding that it did not apply to one breaking out when the prison was on fire, observing that the prisoner was 'not to be hanged because he would not stay to be burnt.' And, in illustration of this doctrine, the construction given to the Bolognian law against drawing blood in the street is often cited. That law enacted that whoever thus drew blood should be punished with the utmost severity, but the courts held that it did not extend to the surgeon who opened the vein of a person falling down in the street in a fit." The application of these just and sensible views to the facts of the case at bar requires that the judgment and order appealed from be reversed, and the defendant discharged. It is so ordered.