## CASE OF THE CHINESE MERCHANT.

### In re LOW YAM CHOW.

*(Circuit Court, D. California. September 5, 1882.)*

1. **CHINESE MERCHANT'S CERTIFICATE OF CHINESE GOVERNMENT.**

   Chinese merchants who resided, on the passage of the act of congress of May 6, 1882, in *other countries than China*, on arriving on a vessel in a port of the United States are not required by said act to produce certificates of the Chinese government establishing their character as merchants as a condition of their being allowed to land. Their character as such merchants can be established by parol evidence. The certificate mentioned in section 6 of that act is evidently designed to facilitate proof by Chinese, other than laborers, coming from China and desiring to enter the United States, that they were not of the prohibited class. The particulars which the certificate must contain show that it was to be given by the Chinese government to those then residing there, as their place of residence in China is to be stated.

2. **SAME—ACT OF CONGRESS CONSTRUED.**

   The act of May 6, 1882, was intended to carry out the provisions of the supplementary treaty of November, 1880, modifying the treaty of 1868 between China and the United States, and its purpose must be held to be what the treaty authorized,—to put a restriction upon the emigration of *laborers*, including those skilled in any art or trade,—and not to interfere with the commercial relations between China and this country, by excluding Chinese merchants, or putting unnecessary and embarrassing restrictions upon their coming to this country.

3. **STATUTES—RULE OF CONSTRUCTION.**

   All laws are to be so construed as to avoid an unjust or absurd conclusion; and general terms are to be so limited in their application as not to lead to injustice, oppression, or an absurd consequence.

4. **CHINESE MERCHANT COMING FROM CHINA—EVIDENCE.**

   Whether a Chinese merchant, teacher, etc., arriving from *China* and failing to produce the certificate required by section 6, could by satisfactory evidence of his real character overcome the presumption that he is a laborer raised by the absence of the certificate, and establish the right secured by the treaty to go and come of his own free will and accord, it is not necessary to decide in this case. HOFFMAN, D. J.

*Habeas Corpus.* The facts sufficiently appear in the opinion of the court.

*McAllister & Bergin,* for petitioner.

*Milton Andros,* for respondent.

*Philip Teare,* Dist. Atty., for collector of port.

Before FIELD, Justice, and HOFFMAN, D. J.

FIELD, Justice. The petitioner is a subject of the emperor of China, and alleges that he is restrained of his liberty on board of the American steamship City of Rio de Janeiro, in the port of San Francisco, by its captain, in contravention of the constitution and the

treaty between the United States and his country. He states in his petition in substance as follows: That he is a Chinese merchant by occupation, and not a Chinese laborer; that he was such merchant in Peru for about 10 years; that upon the breaking out of the war between that country and Chili he left Peru and established himself at Panama, in the republic of New Granada; that for the last five years he has also been a member of the firm of Chow Kee & Co., merchants in San Francisco; that on the thirty-first day of July last he took passage at Panama on the steam-ship which arrived at the port of San Francisco on the seventeenth of August, and that its captain refuses to allow him to land, but detains him on board of the vessel under the claim that his landing in the United States is prohibited by the act of congress of May 6, 1882, "to execute certain treaty stipulations relating to Chinese;" that such claim is unfounded; that the petitioner has been a merchant by occupation for the last 12 years, and has never been a laborer within the meaning of the treaty. He therefere prays that a writ of *habeas corpus* be issued to the captain to produce him, and that he be discharged from his arrest. The writ being issued, the captain makes a return admitting the detention of the petitioner, and justifying it under the act of congress.

On the hearing, proof was received, against the objection of counsel, of the truth of the petitioner's averment that he is a merchant by occupation, and has been such for years either in Peru or at Panama. No attempt to impeach this evidence was made.

Two questions are thus presented for determination: (1) Whether Chinese merchants, who resided, on the passage of the act of congress, in other countries than China, on arriving on a vessel in a port of the United States, are required to produce certificates of the Chinese government establishing their character as merchants, as a condition of their being allowed to land; (2) whether their character as such merchants can be established by parol proof. For a correct solution of these questions some reference must be had to the treaties between China and this country: In the fifth article of the one concluded in July, 1868, generally known as "the Burlingame treaty," the contracting parties declare that "they recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects respectively from the one country to the other, for purposes of curiosity, of trade, or as permanent residents." In its sixth article they declare that "citizens

of the United States visiting or residing in China shall enjoy the same privileges, immunities, or exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation; and, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions in respect to travel or residence as may be enjoyed by the citizens or subjects of the most favored nation."

While these articles remained in full force no legislation by congress looking to a suspension of or restriction upon the immigration of Chinese, engaged in any lawful occupation, was possible without a breach of faith towards China. And yet it was discovered that the physical characteristics and habits of the Chinese prevented their assimilation with our people. Conflicts between them and our people, disturbing to the peace of the country, followed as a matter of course, and were of frequent occurrence. Chinese laborers, including in that designation not merely those engaged in manual labor, but those skilled in some art or trade, in a special manner interfered in many ways with the industries and business of this state. Their frugal habits, the absence of families, their ability to live in narrow quarters without apparent injury to health, their contentment with small gains and the simplest fare, gave them great advantages in the struggle with our laborers and mechanics, who always and properly seek something more from their labors than sufficient for a bare livelihood, and must have and should have something for the comforts of a home and the education of their children. A restriction upon the immigration of such laborers was therefore felt throughout this state to be necessary, if we would prevent the degradation of labor and preserve all the benefits of our civilization. Through the urgent and constantly-repeated appeals from the Pacific coast, the government of the United States was induced to make application to the government of China for a modification of the treaty of 1868; and the supplementary treaty of November, 1880, was the result. The first article of this treaty provides that "whenever, in the opinion of the government of the United States, the coming of *Chinese laborers* to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country, or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it;" declaring at the same time that "the limitation or suspension shall be reasonable, and shall *apply only to*

*Chinese who may go to the United States as laborers, other classes not being included in the limitations.*" The second article further declares that "Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body or household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation."

The act of May 6, 1882, was framed in supposed conformity with the provisions of this supplementary treaty. In the inhibitions which it imposes upon the immigration of Chinese there is no purpose expressed in terms to go beyond the limitations prescribed by the treaty. And we will not assume, in the absence of plain language to the contrary, that congress intended to disregard the obligations of the original treaty of 1868, which remains in full force except as modified by the supplementary treaty of 1880. This latter treaty only authorizes suspensive or restrictive legislation with respect to the importation of Chinese laborers. It provides, in express terms, as seen above, that the limitation or suspension shall apply only to them, "*other classes not being included in the limitations.*"

The act of congress declares in its first section that after the expiration of 90 days from its passage, and for the period of 10 years, "the coming of *Chinese laborers* to the United States" is suspended, and that during such suspension "it shall not be lawful for any *laborer* to come, or, having so come after the expiration of said 90 days, to remain within the United States." And its second section makes it a misdemeanor, punishable by fine and imprisonment, for the master of any vessel to knowingly bring within the United States on such vessel, and land or permit to be landed, any *Chinese laborer* from any foreign port or place.

The third section excepts from these provisions Chinese laborers who were in the United States on the seventeenth of November, 1880, or who shall have come before the expiration of 90 days from the passage of the act, and shall produce to the master of the vessel and the collector of the port certain prescribed certificates of identification, containing the name, age, occupation, last place of business, and physical marks or peculiarities of the laborer.

The act, conforming to the supplementary treaty, is aimed against the immigration of *Chinese laborers*—not others. The sixth section,

which is supposed to cover the present case, was not intended to prohibit the coming to the United States of other classes of persons, but to prevent, by a prescribed mode of proof, the evasion of the prohibition against the coming of laborers. Its language is as follows: "That in order to the faithful execution of articles 1 and 2 of the treaty in this act before mentioned, every Chinese person other than a laborer, who may be entitled by said treaty and this act to come within the United States, and who shall be about to come to the United States, shall be identified as so entitled by the Chinese government in such case, such identity to be evidenced by a certificate issued under the authority of said government, which certificate shall be in the English language, or (if not in the English language) accompanied by a translation into English, stating such right to come, and which certificate shall state the name, title, or official rank, if any, the age, height, and all physical peculiarities, former and present occupation or profession, *and place of residence in China* of the person to whom the certificate is issued, and that such person is entitled, conformably to the treaty in this act mentioned, to come within' the United States. Such certificate shall be *prima facie* evidence of the facts set forth therein, and shall be produced to the collector of customs, or his deputy, of the port in the district of the United States at which the person named therein shall arrive."

The certificate mentioned in this section is evidently designed to facilitate proof by Chinese other than laborers, coming from China and desiring to enter the United States, that they are not within the prohibited class. It is not required as a means of restricting their coming. To hold that such was its object would be to impute to congress a purpose to disregard the stipulation of the second article of the new treaty, that they should be "allowed to go and come of their own free will and accord." Nor is it required, as a means of proving their character, from merchants and others not laborers domiciled out of China when the law was passed, and coming here from such foreign jurisdiction. The particulars which the certificate must contain show that it was to be given to those then residing there, for their *place of residence in China* is to be stated. Independently of this consideration, that government could not be expected to give, in its certificate, the particulars mentioned of persons resident—some, perhaps, for many years—out of its jurisdiction. Neither the letter nor the spirit of the act calls for a construction imputing to congress the exaction of a condition so unreasonable.

The general language of the twelfth section, "that no Chinese person shall be permitted to enter the United States by land without producing to the proper officer of customs the certificate required in the act of Chinese persons seeking to land from a vessel," is to be construed as applying to such persons as are by previous sections prohibited from coming, not as extending the prohibition.

We repeat what we said in the case of Ah Tie and other Chinese laborers, that all laws are to be so construed as to avoid an unjust or an absurd conclusion; and general terms are to be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. In addition to the illustrations of this rule there given, we may refer to two instances furnished by the decisions of the supreme court. A law of congress declares that whoéver willfully obstructs or retards the carrier of the mails of the United States, shall be deemed guilty of a public offense and be punished by a fine. A mail carrier in Kentucky was arrested by the sheriff upon a charge of murder, and for the arrest the sheriff was indicted. The supreme court held that the general language of the act of congress was not to be construed to extend to the case; for it could not be supposed that congress intended to interfere with the enforcement of the criminal laws of the state, in its legislation to prevent unnecessary obstruction in the carriage of the mails. It would have been absurd to hold that in order to secure the speedy transportation of the mails, immunity from punishment for a crime was given to the mail carrier. *U. S.* v. *Kirby,* 7 Wall. 482.

So the act of congress for the recovery of the proceeds of captured and abandoned property during the late war required the claimant in the court of claims to prove that he had never given aid or comfort to the rebellion; yet the supreme court held that one who had been pardoned by the president was relieved from this requirement. The general language of the act covered his case, but as the pardon in legal effect blotted out the guilt of the offender,—that is, closed the eyes of the court so that it could not be considered as an element in the determination of his case,—the pardon was deemed to take the place of the proof, and relieved him from the necessity of establishing his loyalty.

"It is not to be supposed," said the supreme court, "that congress intended, by the language of the act, to encroach upon any of the prerogatives of the president, and especially that benign prerogative of mercy which lies in the pardoning power. It is more reasonable to conclude that claimants restored

to their rights of property by the pardon of the president were not in contemplation of congress in passing the act, and were not intended to be embraced by the requirement in question. All general terms in statutes should be limited in their application so as not to lead to injustice, oppression, or any unconstitutional operation, if that be possible. It will be presumed that exceptions were intended which would avoid results of that nature." *Carlisle* v. *U. S.* 16 Wall. 153.

These cases would be sufficient to justify us in giving a construction to the act under consideration in harmony with the supplementary treaty, even were the general terms used susceptible of a larger meaning. Its purpose will be held to be, what the treaty authorized, to put a restriction upon the emigration of laborers, including those skilled in any trade or art, and not to interfere, by excluding Chinese merchants, or putting unnecessary and embarrassing restrictions upon their coming, with the commercial relations between China and this country. Commerce with China is of the greatest value, and is constantly increasing.* And it should require something stronger than vague inferences to justify a construction which would not be in harmony with that treaty, and which would tend to lessen that commerce. It would seem, however, from reports of the action of certain officers of the government—possessed of more zeal than knowledge—that it is their purpose to bring this about, and thus make the act as odious as possible.

We are of opinion that the section requiring a certificate for Chinese merchants coming to the United States does not apply to those who resided out of China on the passage of the act of congress, and that proof of their occupation may be made by parol.

It follows that the petitioner must be discharged, and it is so ordered.

*According to the statement furnished by the Chinese consul, the value of of exports to China from the United States, and from China to the United States, for the year in which the Burlingame treaty was concluded, (1868,) amounted to $15,365,013, and for the fiscal year ending June 30, 1881, amounted to $27,765,409, almost doubling our commerce in 13 years. Of this latter amount $16,185,165 of the merchandise passed through the port of San Francisco, and 70 per cent. of it was shipped by Chinese merchants. When the Burlingame treaty was concluded the export of flour from California at the port of San Francisco amounted to about 20,000 barrels a year. The export of this article has steadily increased since, until in the last year (1881) it amounted to 271,118 barrels, 90 per cent. of which was shipped by Chinese merchants.

HOFFMAN, D. J. The petitioner alleges that he is unlawfully restrained of his liberty in contravention of the constitution of the United States, and of the treaty between the United States and the empire of China, commonly known as the Burlingame treaty; that he is a Chinese merchant, and not a Chinese laborer; that he was a Chinese merchant at Peru for about 10 years, and that thereafter, upon the outbreak of war between Chili and Peru, he left the latter country and established himself as a merchant at Panama, in the republic of New Granada, where he still resides; that for the last five years he has been a member of the firm of Kwong Sing Lung, Chow Kee & Co., merchants, in this city; that on the thirty-first day of July, 1882, he took passage at Panama on board the American steam-ship Rio de Janeiro, and arrived at this port on the said steam-ship on the seventeenth day of August, 1882; but that he is unlawfully restrained of his liberty, and not allowed to land by the master of said steamer, upon the claim that under provisions of the act of May 6, 1882, entitled "An act to execute certain treaty stipulations relating to Chinese," he has no right to land. The return of the master of the steamer admits the allegations of the petition as to the embarkation of this petitioner at Panama and his arrival at this port, but disavows all knowledge or information sufficient to enable him to admit or deny the allegation of this petitioner that he is a Chinese merchant and not a Chinese laborer. But he claims that the petitioner cannot lawfully land in the United States by reason of the non-production by him to the collector of the certificate of identification, etc., and by said act of May 6, 1882, required to be produced by every Chinese person other than a laborer arriving in the United States.

On the hearing, the truth of the allegations of the petition was established beyond doubt or controversy. It appeared that the petitioner is, as he claims to be, a Chinese merchant residing in Panama; that the firm in this city, of which he is a member, is largely engaged in commerce, and that his object in visiting San Francisco was to make purchases for his establishment at Panama, and to adjust his accounts with his partners in this city. The proofs offered by petitioner were corroborated by his dress, appearance, and manners. He evidently did not belong to the class of Chinese laborers or coolies which the treaty and the act of congress intended to exclude; but, on the contrary, he belongs to a class which, by the express terms of article 2 of the treaty, are allowed to go and come "of their own free will

and accord," and to enjoy "all the rights, privileges, immunities, and exemptions accorded to the citizens and subjects of the most favored nation."

But it is strenuously urged by the district attorney that under the provisions of the sixth section of this act no evidence is admissible to prove the petitioner not to belong to the prohibited class, except the production of the certificate of identification therein required, and that the failure to produce such a certificate raises a conclusive presumption that the person so failing to produce it is a Chinese laborer. He even contends that an indictment against the master for landing, or permitting to land, a Chinese laborer would be sustained by proof that the person so landed did not produce to the collector the certificate of identification required by section 6.

The argument chiefly pressed by the district attorney in support of this construction was that to admit parol evidence as to the character of the immigrant would open the door to endless evasions of the act, and that any Chinese laborer could procure any number of witnesses who would swear him to be a merchant, student, teacher, or traveler from curiosity, and that this testimony the United States would rarely be able to controvert. The suggestion is not without force, though the danger is, I think, exaggerated. It would not be easy, in all cases, for a Chinese laborer or coolie, whom alone it was the intention of the act to exclude, to simulate the dress, manners, and general appearance and bearing of the merchant, student, teacher, or traveler, who, in China, almost as much as in India, are separated from the common laboring classes by social and external differences which almost amount to a distinction of caste. But even if the apprehensions of the district attorney were well founded, the construction he contends for would be inadequte to prevent the evil, unless we also hold that on an indictment against the master or a libel against the ship, the non-production of the certificate shall be conclusive evidence that the passenger landed is a laborer. For if the master or the claimant of the vessel be allowed to show his true character by parol, the door would be opened to all the evasions of the law which the district attorney fears.

Section 6 is as follows:

" That in order to the faithful execution of articles 1 and 2 of the treaty in this act before mentioned, every *Chinese person* other than a laborer, who may be entitled by said treaty and this act to come within the United States, and who shall be about to come to the United States, shall be identified as so en-

titled by the Chinese government in each case, such identity to be evidenced by a certificate issued under the authority of said government, which certificate shall be in the English language, or (if not in the English language) accompanied by a translation into English, stating such right to come, and which certificate shall state the name, title, or official rank, if any, the age, height, and all physical peculiarities, former and present occupation or profession, *and place of residence in China* of the person to whom the certificate is issued, and that such person is entitled, conformably to the treaty in this act mentioned, to come within the United States. Such certificate shall be *prima facie* evidence of the fact set forth therein, and shall be produced to the collector of customs or his deputy of the port in the district of the United States at which the person named therein shall arrive."

It will be observed that the terms of this section lend no support to the position taken by the district attorney. A certificate of identification is, it is true, required to be produced to the collector, but it is not provided that the Chinese person failing to produce it shall not be allowed to land, much less that the certificate shall be the only proof of the right of the passenger to come within the United States, and that in its absence he shall be conclusively presumed to be a Chinese laborer, and that this presumption exists even in a criminal proceeding against the master for "landing, or permitting to land, a Chinese laborer."

In the debates in the senate on the original bill, which contained provisions nearly identical with those of section 6 in the bill which obtained the president's approval, it was strenuously urged that to exact a compliance with "the cumbersome and burdensome provisions" with regard to certificates of identification, and which are required of the subjects of no other power, was a violation of the treaty which allows the permitted classes to go and come of their own free will and accord, and which guaranties to them all the rights, privileges, immunities, and exemptions accorded to the citizens and subjects of the most favored nation. To this it was replied that the provisions in the bill were merely for purposes of identification; that they were in the interest of the classes permitted to come; that it was no hardship to the permitted classes to leave it to the Chinese government to say who are merchants, traders, teachers, etc., and therefore not within the excluded class. But if the bill had declared, or had been supposed to declare, by necessary implication, that no Chinese person unprovided with a certificate should, under any circumstances, be allowed to land, and that its *non-production* should be conclusive evidence that the passenger was a Chinese laborer, while

*its production* should only be *prima facie* evidence of the facts set forth therein, the bill might have encountered an opposition which which would have endangered its passage.

The circumstances of the case before us do not require a definitive decision of the question whether a Chinese merchant, teacher, etc., arriving from China, and failing to produce the certificate required by section 6, might not overcome, by satisfactory evidence of his real character, the presumption that he is a laborer raised by the absence of the certificate, and establish the right secured by the treaty to go and come of his own free will and accord. The petitioner has been for many years a resident of this city, of Callao, and latterly of Panama. He comes to the United States on a temporary visit for purposes of trade. At the time of his embarkation on board an American vessel at Panama, the law which requires the production of a certificate had not gone into effect. By referring to the terms of section 6, which have been cited, it will, we think, be apparent that the persons contemplated in its provisions are Chinese merchants, etc., coming *from China* to the United States, and not Chinese merchants coming to this country from other parts of the world. The certificate is to be furnished by the Chinese government, or under its authority. It must state the name, age, height, and all physical peculiarities, former and present occupation, and *place of residence in China*, of the person to whom it is issued. How could a Chinese merchant who has resided, it may be for 10 or 20 or 30 years, in London or Calcutta or Callao or Panama, obtain such a certificate? Certainly not without going to China for the purpose. And how, if he should revisit his country with that object, could the certificate state, as required, "*his place of residence in China?*" The evil which the treaty and the law were intended to remedy, was the unrestricted immigration from the teeming population of China of laborers, whose presence here in overwhelming numbers was felt by almost all thoughtful persons to bear with great severity upon our laboring classes, and to menace our interests, our safety, and even our civilization. But, while anxious to attain this end, an equal solicitude was felt to adopt no legislation which should violate the plighted faith of the nation, unnecessarily give offense to the Chinese government, or hinder or impede our large and growing commerce with China. Congress may therefore reasonably be supposed to have thought that the great object of the bill would be sufficiently attained by exacting certificates of identification from Chinese emigrants from China, from whence the great influx of laborers was feared,

and from whence it chiefly comes. And it may have advisedly refrained from imposing the same requirement upon Chinese merchants, etc., residents in other countries,—a requirement which it would be almost impossible for them to fulfill; nor can we suppose that the Chinese government would regard such an exaction, which practically excludes all their subjects residing abroad from coming to the United States, as a reasonable or even honest compliance with the treaty stipulation which guaranties to Chinese merchants, etc., the right to come and go of their own free will and accord.

In the case before us, not only was it impossible for the petitioner to obtain the certificate required, but at the time he embarked on board an American ship at Panama no law was in operation requiring him to do so. If he is not permitted to land, it will not be because he has no right to do so under the treaty,—for he has clearly and indisputably shown that he does not belong to the excluded class,—but because he does not produce evidence which it was impossible for him to procure, and which, when, by embarking on board an American ship, he came under our flag and within our jurisdiction, he was not required by any law then in effect to obtain.

We are clearly of opinion that the case is not within the provisions of the sixth section of the act.

Some further observations may not be inappropriate. It is well known that the law under consideration encountered wide-spread and vehement opposition. It was attacked as the servile echo of the clamors of the sand lot; as fraught with danger to our commercial relations with China; as inconsistent with our national policy; as obstructing the spread of Christianity; and as violative not only of the treaty, but of the inherent rights of man. It was defended as absolutely indispensable to the preservation of our social and political systems and even to our safety. Nothing would more gratify the enemies of the bill than that in its practical operation it should be found to be unreasonable, unjust, and oppressive. If Chinese merchants coming here from all parts of the world are excluded because they fail to produce a certificate impossible for them to obtain; if a merchant long resident here, and on his way to New York by a route which for a short distance passes through Canada, is to be stopped at Niagara bridge for want of a certificate, and on retracing his steps is to be stopped at Detroit on a similar pretext, and on the ground that in each case he is to be regarded as coming to the United States from a foreign country, within the true intent and meaning of the treaty and the law; if a Chinese merchant similarly resident in this

city, and desirous of temporarily visiting British Columbia or Mexico, is to be refused, as it seems he must be, a certificate by the custom-house authorities, under section 4, on the ground that he is not a laborer, and on his return, after a few weeks' absence, is to be prohibited from landing on the ground that he has no certificate of identification issued by the Chinese government under section 6; if, in these and similar cases, the operation of law is found to work manifest injustice, oppression, and absurdity,—its repeal cannot long be averted.

I am satisfied that the friends of this law do it the best service by giving to it a reasonable and just construction, conformable to its spirit and intent, and the solemn pledges of the treaty, and not one calculated to bring it into odium and disrepute.

See *In re Quong Woo, ante,* 229; *In re Ah Sing, ante,* 286; *In re Ah Tie, ante,* 291, and note.