UNITED STATES ex rel. ANDERSEN v. BURKE, Collector.

(Circuit Court, S. D. Alabama. December 18, 1899.)

No. 222.

1. ALIENS—CONSTRUCTION OF IMMIGRATION LAWS—WHO ARE IMMIGRANTS.
The immigration laws of the United States, like all other statutes, must be given a sensible construction having reference to their purpose, and, as so construed, they apply only to such aliens as enter or are brought to this country with the intention that they shall become residents thereof.

2. SAME—ALIEN SEAMEN—LIABILITY OF VESSEL FOR BRINGING INTO UNITED STATES.
The immigration laws have no application to alien seamen who constitute the bona fide crew of a vessel trading in the ports of the United States, and who enter such ports with their ship in the discharge of the duties of their employment, and without any intention of becoming residents of this country; and the master of a vessel cannot be subjected to the fine or refusal of his clearance papers, provided by the act of March 3, 1891, as a penalty for refusing to return upon his vessel immigrants of the prohibited classes brought into this country, because an alien seaman, who is one of the crew, escapes from his ship while in port, before the expiration of his term of service, without having been discharged or paid, and without the consent or knowledge of the master, and the master is unable to secure his arrest and return to the ship.

8. SAME—JURISDICTION OF COURTS—CONCLUSIVENESS OF DECISION OF IMMIGRATION OFFICER.
The provisions of Act Aug. 18, 1894, making the decision of the appropriate immigration or customs officer excluding an alien from admission to the United States under any law or treaty conclusive upon the courts, does not preclude a court from entertaining jurisdiction to determine the question whether such alien was in fact an immigrant within the meaning of such laws.

4. SAME—ENFORCEMENT OF PENALTY AGAINST SHIP.
The right to enforce a penalty against a foreign ship for an alleged violation of the immigration laws is essentially a judicial right, and when it is attempted by an executive officer to constrain the shipmaster to pay a penalty, or when clearance is refused his ship for failure to pay such penalty, the courts are not excluded from consideration of the question by the act of August 18, 1894, which makes the decision of such officer conclusive only as to the status of immigrants.

This was a petition for a writ of mandamus to compel the collector of the port of Mobile to grant clearance to the Norwegian bark Norma.

Pillans, Hanaw & Pillans, for complainant.

M. D. Wickersham, U. S. Atty., for defendant.

TOULMIN, District Judge. The case made upon this application for mandamus as appears upon the petition and return to the alternative writ is that the Norwegian vessel Norma, lawfully trading to the United States, entered the port of Mobile about a month ago,

to perform a charter under which she was to load and carry there-from a cargo of timber to Europe. Having laden such cargo aboard, her master duly applied for clearance to the collector of customs at the port, who declined to grant clearance to the vessel upon this state of facts, that is to say: The said vessel came to Mobile with a crew articled for a voyage not to end in the United States, but to the United States and outward to Europe again. In that crew was an alien seaman, who, on arrival of the vessel at Mobile, had endeavored to obtain his discharge from the ship on the claim that he was too ill to remain with her. He was thereupon examined by a reputable physician at this port, whom the master called in for the purpose, and found by the physician to be sound. The master therefore refused to discharge him. Thereafter this seaman remained on board, doing duty, until about a week before the ship was ready to sail, when he went ashore without special leave, and continued to remain ashore for an unusual time, whereupon the master appealed to the Norwegian consul for process for his arrest and return to the ship. While at the consul's office pending such application, the seaman came to the office, having been sent to the consul by the collector of customs as an alien pauper immigrant, with instructions that he be returned to the master of the ship, to be carried by the ship out of the country. Thereupon the said consul, in the presence of the master and the man, stated to the man that he would be imprisoned if he did not return to duty on the vessel, which he at once declared his willingness to do, and thereupon the master did not insist on his application for his arrest. The seaman did return to duty on the vessel, where he was found that evening by the master, apparently docile, and willing to perform his duties. The next day said seaman was again absent from the vessel, without leave from the master, having left on the vessel his bag, baggage, and belongings. He had not been discharged, and had received none of his pay. This last absenting of himself was two days before the master applied for clearance at the custom house. When he so applied, he was informed by the collector that the latter could not and would not clear him, because he had not this seaman on board, and that he must have him arrested, and brought on board. This the master attempted to do by getting a warrant of arrest for the man, and by using all diligence in his power to have him found; but the officers, being unable to find him, failed to execute the warrant. The collector thereupon declared that the said master had violated the immigration statutes by not holding the seaman on his return after his first absence, and was subject to a fine of $300, which the collector required that the master should pay before he would grant a clearance of the ship; whereupon the master applied to this court for a writ of mandamus to the collector to require him to clear the vessel without imposing such fine.

The legislation contained in the various statutes that have been passed relating to immigration is clearly directed against the immigration into this country of certain classes of persons who come in with the intent to enter into and become a part of the mass of its citizenship or population. Immigration is defined to be the entering into a country with the intention of residing in it. The earlier stat-

utes merely prohibit contract laborers being brought in. The later ones prohibit the bringing in of immigrants,—persons who come into this country with the intention of remaining, of fixing a residence here,—and who are calculated to become a charge upon the country, or who are unfit, on account of moral character, previous conviction of crime, or disease, to be admitted as citizens. Nothing in the scope of the statutes seems to contemplate, or can be rationally held to contemplate, the prohibition of the bringing within the country by vessels of their crews engaged under contracts made out of the country, to labor on the vessels while approaching and while in the ports of this country, and to sail again with the vessels from this country. By sections 1, 2, and 3 of the act of February 26, 1885 (1 Supp. Rev. St. U. S. p. 479), it is provided that it is illegal for any person to in any way assist or encourage the migration of any alien or foreigner into the United States under previous contract with said alien or foreigner to perform labor or service of any kind in the United States, its territories, or the District of Columbia. Such contracts are avoided, and a penalty of $1,000 is imposed for every such offense as to each alien or foreigner. Thus it is made illegal to assist or encourage the migration of any alien into the United States under previous contract with him to perform labor in the United States; that is to say, it is illegal to assist or encourage any alien to remove or change his residence into the United States under previous contract with him to perform labor in the United States. Now, every foreign seaman on a vessel of this or a foreign country, signed on the articles abroad, is an alien contracted with to perform duty in the United States while the vessel lies in the United States, loading; but he is not contracted with to remove to the United States, or assisted or encouraged to migrate—to change his residence—to the United States, to perform labor there. It is to be assumed that congress uses language employed by it in its enactments in its ordinary meaning and acceptation. The particular statute invoked on behalf of the respondent, being that of March 3, 1891, clearly relates to immigration, and is leveled only against immigrants,—that is, those who are coming to the United States to make it a home,—for in the first section it is declared that certain classes of aliens shall be excluded from admission into the United States "in accordance with the existing acts regulating immigration." The third section excludes the encouragement of immigration to this country of aliens by promise of employment, advertisement, and the like. The fourth makes it unlawful for steamships or transportation companies or vessel owners, by writing or otherwise, to solicit or encourage immigration of aliens into the United States, other than by stating the sailings of their vessels and their facilities. The sixth section forbids the bringing into the United States of any aliens not lawfully entitled to enter, and punishes the offense; and the eighth section provides that upon the arrival by water of alien immigrants at any port it shall be the duty of the master to report the name, nationality, etc., of the alien to the proper officers, and provides for an inspection of these persons before they can be lawfully landed. The tenth section then declares that all aliens who may unlawfully come into the United States shall be sent

back on the vessel by which they were brought in at the cost of the master or owner, and, if the said master shall refuse to receive back such aliens as he unlawfully brought to the United States and as were sent back to the vessel, or shall refuse or neglect to return them to the .port from which they came, he shall be punished in a fine of not less than $300, and shall not have clearance of his ship until it is paid. Here we see 'a definite purpose to exclude the immigration, and the bringing of persons intending to immigrate, into the United States, if they belong to the excluded classes, with definite specific provisions for their deportation by the medium through which they entered the country. If this law applied to the crews of ships generally, by section 6 of this last act, as well as by the section of the previous act cited in the earlier part of this opinion, no vessel, foreign or domestic, could lawfully enter the ports of the United States with an alien seaman on board. I cannot so interpret the law. If it be said that the mere bringing into the United States of these alien seamen may not be an offense, but that landing them would be, notwithstanding the law forbids in the disjunctive,—the bringing into "or" landing,—then we have presented by this contention the duty, as one imposed by congress, that the masters of all ships, American or otherwise, shall either imprison, put under hatches, put in irons, or guard every alien seaman in their crews during their entire stay in port, however protracted by the exigencies to commerce and the ship's loading, lest one of these aliens should set foot at some time on shore for recreation or health, or for supplying his limited needs in the shops of the country. This cannot be the just interpretation of the laws of congress upon the subject of immigration, and such interpretation is not justified by the terms of those statutes, upon a general survey of them in all their parts. These immigration statutes are to be construed as a whole, and not by singling out particular words or sections, and interpreting them according to their strict letter. A thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers. "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence." Holy Trinity Church v. U. S., 143 U. S. 461, 12 Sup. Ct. 512, 36 L. Ed. 228. "Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion." Lau Ow Bew v. U. S., 144 U. S. 59, 12 Sup. Ct. 520, 36 L. Ed. 344. A consideration of the whole legislation on the subject of alien immigration, of the circumstances surrounding its enactment, and of the unjust results which would follow from giving such meaning to it as is here claimed for it, makes it unreasonable to believe that congress intended to include a case like the present one. My opinion is that these statutes do not contemplate the exclusion of the crews of vessels which lawfully trade to our ports, and that they do not, in spirit or in letter, apply to seamen engaged in their calling, whose home is the sea; who are here to-day and gone to-morrow; who come on a vessel into the United States with no purpose to reside

therein, but with the intention, when they come, of leaving again, on that or some other vessel, for the port of shipment or some other foreign port in the course of her trade. To hold that these statutes apply to aliens comprising the bona fide crews of vessels engaged in commerce between the United States and foreign countries would lead to great injustice to such vessels, oppression to their crews, and serious consequences to commerce.

I have carefully considered the ruling of the assistant secretary of the treasury in the case of the crew of the Lancashire, which may be justified by the facts in that particular case, as they existed, and as they were doubtless made known to him. In that case the vessel, which had been partly wrecked on the coast of Jamaica, and partially restored there, and had changed flags, came to Mobile for docking and more complete repair; then to load out a cargo for foreign lands. She had shipped at Kingston, besides the ordinary crew usually required on vessels of her class, a large number of additional men, who desired to come to the United States, and who were engaged at Jamaica to come to Mobile at a wage of one shilling per month each, to work chiefly at pumping the leaking vessel, and to be here discharged,—an absurdly small wage unless the men were working their passage to the United States, as they manifestly were doing. Under such facts as existed in that case, these men, so working their passage at the equivalent of 25 cents for the month, but who were actually paid $5 each for the month's service (where the ordinary wages were $15 per month), and who stipulated for discharge here in the United States, were plainly immigrants, and properly treated as such, and therefore properly deported under the ruling of the secretary; and this, not because bona fide crews of ships fall under the immigration laws, but because they were not a bona fide crew of the ship. Were the court to adopt all the views contained in the letter of instruction of the secretary of the treasury referred to in the Lancashire case, it would not aid the respondent in this case, as it is sufficient to say that the secretary there applied his ruling exclusively to discharged seamen, who came into the United States under the circumstances above stated, on the evident theory that, after they were discharged, they became a part of the mass of the people of the country, and were indistinguishable from any other immigrants. Such is not the case here. I am satisfied that the master of this vessel has committed no offense against the immigration laws, and is entitled to his clearance without paying any fine imposed by such laws.

I am not unmindful of the provision of the act of August 18, 1894, that "in every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final unless reversed on appeal to the secretary of the treasury" (2 Supp. Rev. St. U. S. p. 253), and of the rulings made thereon. Lem Moon Sing v. U. S., 158 U. S. 538, 15 Sup. Ct. 967, 39 L. Ed. 1082; Wong Wing v. U. S., 163 U. S. 228, 16 Sup. Ct. 977, 41 L. Ed. 140; In re Moses (C. C.) 83 Fed. 995, and other cases. Under these decisions the status of any alien, and the question of his right to enter the United States, is ex-

clusively vested in the executive department of the government; and, where it has been legitimately exercised, the courts cannot interfere in behalf of the alien. But no question arises in this case upon that clause of the law, for the reason that, as I have interpreted it, the alien seamen using the ports of the country in their ships are not alien immigrants, and are, therefore, not aliens coming into the country, within the meaning of the statute, and whose right to remain here can be definitely and finally determined by the executive officers of the government. But, besides this, whatever may be the right of any officer to determine the status of a particular alien as between the government and the alien, the right to enforce a penalty against the ship that brings him is essentially a judicial right, and when, therefore, it is attempted on the part of the executive officer to constrain a ship master to pay a penalty, or when clearance is refused to his ship for failure to pay such penalty, the courts are not excluded from a consideration of the question whether a case is made for the imposition of the penalty or the restraint of the ship. Let a peremptory writ of mandamus issue.