# CASES

## ARGUED AND DETERMINED

#### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### TAYLOR v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 16, 1907.)

#### No. 191.

**1. ALIENS—IMMIGRATION LAWS—PERMITTING ALIENS TO LAND FROM VESSEL.**

The provisions of Act March 3, 1903, c. 1012, § 18, 32 Stat. 1217 [U. S. Comp. St. Supp. 1905, p. 283], requiring officers of any vessel bringing an alien to the United States to "adopt due precautions" to prevent the landing of any such alien at any time or place other than that designated by the immigration officers, and making any person in charge of a vessel liable to prosecution if he shall "land or permit to land" any alien except at such designated time and place, are to be construed together, and the master of a ship cannot be held liable for the unlawful landing of an alien from his vessel, if he adopted due precautions to prevent it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Aliens, § 114.]

**2. SAME—CONSTRUCTION OF STATUTE.**

In Immigration Act March 3, 1903, c. 1012, § 18, 32 Stat. 1217 [U. S. Comp. St. Supp. 1905, p. 283], which requires officers of vessels to take due precautions to prevent aliens from landing therefrom, except at the time and place designated by the immigration officers, the word "aliens" is used in its broad and full meaning, and is not restricted to alien immigrants, but includes as well aliens who are members of the ship's crew. While the master of a vessel is not required to prevent officers or members of his crew who are aliens from going on shore in a port of the United States in every case, such section requires him to take reasonable precautions suited to the nature of the case to prevent them from deserting and remaining in this country.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Aliens, §§ 113, 114.]

**3. SAME—PROSECUTION FOR VIOLATION—EVIDENCE.**

The master of a vessel on trial for permitting an alien member of his crew to leave his vessel in New York, in violation of Act March 3, 1903, c. 1012, § 18, 32 Stat. 1217 [U. S. Comp. St. Supp. 1905, p. 283], was properly allowed to be asked on his cross-examination as a witness whether a number of other alien members of his crew did not also desert in that port, as material to the question whether or not he took due precautions to prevent aliens from leaving the vessel, as required by the statute.

**4. WITNESSES—CLAIM OF PRIVILEGE—REVIEW BY APPELLATE COURT.**

The question whether a witness was privileged to refuse to answer a question on the ground that the answer might incriminate him is not be-

152 F.—1

fore an appellate court for review, where the witness did not stand on his privilege, but answered the question.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1053–1057.]

Wallace, Circuit Judge, dissenting, holds that Immigration Act March 3, 1903, c. 1012, § 18, 32 Stat. 1217 [U. S. Comp. St. Supp. 1905, p. 283], properly construed, has no application to alien seamen who are bona fide members of a ship's crew.

In Error to the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon a writ of error to review a judgment of the Circuit Court, Southern District of New York, entered May 21, 1906, on a verdict of "guilty" found by a jury after trial upon an indictment for a misdemeanor, under section 18 of the Immigration Act of 1903 which provides (Act March 3, 1903, c. 1012, 32 Stat. 1217 [U. S. Comp. St. Supp. 1905, p. 283]:

"That it shall be the duty of the owners, officers, and agents of any vessel bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien from such vessel at any time or place other than that designated by the immigration officers, and any such owner, officer, agent, or person in charge of such vessel who shall land or permit to land any alien at any time or place other than that designated by the immigration officers shall be deemed guilty of a misdemeanor, and shall on conviction be punished by a fine for each alien so permitted to land of not less than one hundred or more than one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment."

William G. Choate, for plaintiff in error.
Henry L. Stimson and Michael Byrne, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). Taylor was the captain of the Cunard steamship Slavonia, which arrived at her pier in New York City early in the morning of October 10, 1905, at the end of a voyage from Fiume, Hungary. At the time of her arrival the place of landing designated under the statute by the immigration officers for aliens landing from a vessel was Ellis Island. When the Slavonia was at Fiume, one Elias Ramadonawich, an alien, shipped on her as third cook in the steerage kitchen. He had previously served on an Austrian ship, and showed his previous shipping papers when he signed the articles of the Slavonia. He shipped for the round trip; the terms of the articles being that he should not be paid off until he returned to Fiume. The amount of wages earned by him on his arrival in New York was less than $6.

At a quarter of 6 o'clock in the evening of October 10th, after finishing his day's work he reported to the head of his department that his work was finished, but asked no permission of him, or of any one else, to go ashore. He then went to his room and washed and dressed. After this, with two other members of the crew, he walked down the gang plank out on the pier and into West street. No one stopped him either on the gang plank or on the pier, or interfered in any way with his departure. So far as appears his record during the short time of his service was good. It was the rule of the ship that members of the crew whose records were good could go ashore after the day's work

was over; each department merely keeping enough of its force to do the necessary night duty. No ticket of leave or written permission to the seaman desiring to go ashore was issued, nor any means provided to inform the watchman at the gang plank or on the pier whether any of the crew seeking to go past him had permission to go ashore or not. It does not appear whether on the evening in question there was any watchman, but Ramadonawich saw none, and from defendant's statement of the rule or custom of the ship when in port here it is not apparent that, if he had been there, it would have been his duty to make any inquiry before allowing any of crew to walk off the pier into the city streets.

Ramadonawich never returned to the ship, so that his landing became, as defendant's counsel expresses it, "the ordinary desertion of a roving seaman in a foreign port." The immigration officers first learned of his presence in this country from a letter dated November 10, 1905, received from the superintendent of the Flatbush Poorhouse. An inspector went in search of him, and found him (November 28th) in the Metropolitan Hospital, where he had been for 16 days. Evidently it did not take long for him to "become a public charge."

The court instructed the jury that, under section 18, "if the captain of the ship does not use due precaution to shut off opportunity for *\* \* \** desertion and landing, due precaution to prevent the overt act which the alien does, then he would fall under the condemnation of the act." Elsewhere he instructed them:

"It is his duty to exercise the care that any good business man in that occupation would exercise; take the precautions that such a man would take and see to it that men who are aliens and part of his crew, if allowed to go ashore, should be allowed to do so under such rules, discipline, and restraint as would tend to bring them back to the ship. Now, if the captain has done that he has done his whole duty, and that is the essential thing for you to grasp and say what would a typical business man in that occupation have done under those circumstances."

This seems to us an entirely fair and reasonable construction of this section. It gives force to all the clauses of its single sentence, coupling the penal provisions against permitting to land with the provisions requiring the adoption of due precautions against such landing, and thus making the test of offense committed, not the alien's mere landing, but the failure to adopt due precautions to prevent it. The statute certainly was not intended to make the owners, officers, and agents insurers against the escape of every alien who might be on board the vessel when she reached this port, and the language used does not require so harsh a construction. The careful and prudent man, who can satisfy a jury that he adopted precautions reasonably adequate to prevent the landing, need be under no apprehension that he incurs a penalty whenever an alien who has arrived in his ship steps ashore.

There was evidence which is discussed in the briefs as to the desertion of seamen generally in the port of New York, as to granting shore leave, and as to the extent to which seamen can be confined to the ship. None of this need be considered here. It deals with the question whether due precautions were taken, and that question was one wholly for the jury under proper instructions.

The main contention of plaintiff in error is that the word "alien," in section 18, does not include seamen. The reasons why we do not find this contention persuasive may be briefly stated:

The word "alien" is a broad one, with a definition wholly unambiguous and clearly understood by all, lawyers and laymen alike. To warrant a construction which will restrict the meaning of such a word deliberately selected by the draftsman of a statute, there must be something highly persuasive to show an intent not as far reaching as the use of such a word would import. The Supreme Court, in Holy Trinity Church v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, construing an earlier immigration statute, found that certain broad language used therein should be given a restricted meaning, because of the "familiar rule that a thing may be within the letter of the statute and yet not within its spirit, nor within the intention of its makers." But, as was subsequently pointed out by the same court, such cases are few and exceptional, and only arise when there are cogent reasons for believing that the letter does not fully and accurately disclose the intent, for the "lawmaker is presumed to know the meaning of words and the rules of grammar." As in that case (U. S. v. Goldenberg, 168 U. S. 95, 18 Sup. Ct. 3, 42 L. Ed. 394), so in this, the language of the act, interpreted in its ordinary sense, "does not offend the moral sense. Holy Trinity Church v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226. It involves no injustice, oppression, or absurdity. U. S. v. Kirby, 7 Wall. 482, 19 L. Ed. 278; McKee v. U. S., 164 U. S. 287, 17 Sup. Ct. 92, 41 L. Ed. 437."

It may safely be assumed that the surest guide to the intent of a legislative body will be found in the recorded action of that body itself. Examination of these so-called "immigration statutes" discloses the fact that they have been frequently amended and recast, almost always in the direction of a more drastic exclusion. A review of some of these changes, following decisions of the courts which tended to relax the provisions of earlier acts, will be found in Re Ellis (C. C.) 124 Fed. 637. Turning, then, to the statute book, we find that section 18 of the act of 1903 (now under consideration) substantially re-enacts part of section 8 of the act of March 3, 1891. Act March 3, 1891, c. 551, 26 Stat. 1085 [U. S. Comp. St. 1901, p. 1298]. In the earlier statute it was made the duty of officers of vessels to adopt due precautions to prevent the landing "of any alien immigrant." The later statute makes it the duty of these officers to prevent the landing "of any alien" (omitting the word "immigrant"). "Alien immigrant" is a less comprehensive term than "alien," and, when it is deliberately discarded for the broader term, the change is highly significant. That the change was deliberate is also apparent. It was no single instance which might be accounted for by some clerical oversight. In sections 12, 13, 17, 20 the term "alien" was substituted for the term "alien immigrant" found in earlier acts. See section 8, Act March 3, 1891; sections 1, 2, 6, Act March 3, 1893; Act Oct. 19, 1888, c. 1210, 26 Stat. 566 [U. S. Comp. St. 1901, p. 1294]. Significantly, also, the act refers, in section 2, to the "admission," not the "immigration," of the excluded classes of aliens; in section 3 to the "importation," not merely the "immigration," of prostitutes; in sections 4, 5, and 6 to "importa-

tion or migration" of contract laborers; in section 9 to the "bringing to the United States of any alien afflicted with a loathsome or contagious disease"; in sections 12 and 13 to the "arrival of any alien"; in section 19 to "all aliens brought into this country in violation of law"; in section 20 to "any alien who shall come into the United States in violation of law"; in section 24 to "the right of any alien to enter the United States"; and in section 38 to the permitting of any "person who disbelieves in * * * organized government * * * to enter the United States." Such action by Congress would seem to indicate an intent to use the word "alien" in its ordinary and comprehensive meaning.

The diligence of counsel on both sides has submitted excerpts from the reports of committees and the debates in Congress upon this act while on its passage. It is sufficient to refer to them without quoting. They clearly indicate that Congress was satisfied that the use of the word "immigrant" had given rise to a construction of the earlier acts which rendered them inadequate to accomplish their purpose, and made it necessary to adopt the broader term "alien." 57th Congress, 1st Sess., 9 Sen. Rep. No. 2119; Congressional Record 57th Congress, 1st Sess. vol. 35, pt. 6, p. 5764; 57th Congress 1st Sess. H. R. Rep. No. 982; Congressional Rec. 57th Congress, 1st Sess. p. 5763; Congressional Record, 9 Sen. R. No. 2119, p. 137; Congressional Record 57th Congress, 1st Sess. p. 5816; 57th Congress, 1st Sess. 9 Sen. Rep. No. 2119, p. 135; 57th Congress, 1st Sess. Sen. Rep. No. 2119, pp. 152, 130; 57th Congress, 2d Sess. 37; Congressional Record, pt. 1, pp. 135, 136. In view of such an illumination as to the intent of Congress, the mere circumstance that the title is "An act to regulate the immigration of aliens into the United States" is immaterial.

The reasons urged by plaintiff in error for construing the section so as to read "aliens, other than bona fide members of a ship's crew," may next be considered. It is suggested that the crew of a vessel cannot properly be held to be "brought to the United States" by such vessel, because the word "bring" is used in the sense of "import." Cunard Co. v. Stranahan (C. C.) 134 Fed. 318. We do not see why seamen, who upon arrival become "importations" by leaving the ship and entering into the general body of resident population, are not "brought" here by the vessel as much as its passengers are.

It is next suggested that the statute, if held to cover seamen, would be so harsh and oppressive that it cannot be supposed that Congress would have passed such an act; and it is argued that every time an alien seaman or officer went ashore to report to his ship's owner, or to the consul, or to the customs authorities, the master would be liable to fine and imprisonment. This puts an unreasonable construction on the act. The offense is failure to provide due precautions against landing. It could not be held that there was any such failure where a trusted and apparently trustworthy officer or seaman was thus engaged temporarily on shore about the ship's business. Where a Chinese exclusion act made it a misdemeanor for the master of a vessel "to land or permit to be landed" any Chinese laborer, it was held that Chinese seamen would have the "right to be on shore temporarily, and not otherwise employed than in the business of the vessel during her stay in port."

In re Moncan (C. C.) 14 Fed. 44. See, also, In re Ah Kee (D. C.) 22 Fed. 519, In re Jam (D. C.) 101 Fed. 989.

Reference is made to U. S. v. Burke (C. C.) 99 Fed. 895, and Moffit v. U. S., 128 Fed. 375, 63 C. C. A. 117, as holding that the term "all aliens" did not include seamen. The opinions in both these cases show clearly that the conclusion of the court was induced by the circumstance that the statutes down to that date (1891) were directed only against the admission of "alien immigrants"; but, as we have seen, the present act is textually, and apparently intentionally, of broader scope.

Attention is called to various sections of the act providing that the master shall deliver to the customs officers lists or manifests, which shall state as to each alien his name and sex, whether he has a ticket to final destination, and whether the alien has paid his own passage; that all aliens arriving by water shall be listed in convenient groups, and each head of a family given a tag or ticket of identification; and that the immigration officers may temporarily remove the aliens so listed for examination. And comment is made on the absurdity of requiring the captain with all the officers and crew of a foreign ship, manned wholly by aliens, to list and tag themselves and proceed to Ellis Island leaving the ship without any persons in charge even to watch her, much less to work and navigate her. These difficulties, however, are more apparent than real. When a vessel brings to this country aliens, who, by coming aboard as passengers under no contract to return, have advised the captain that upon arrival they expect to leave the ship permanently and disappear into the general body of the population, he must take the steps to assist the immigration officers which these sections require; but where he is not thus advised, as in the case of a seaman of his crew who has signed articles for return voyage, he will discharge his full duty if he adopts due precautions to prevent that alien from effecting a landing which will defeat the objects of the statute by enabling him to become a part of the national population without having first been passed by the examining officers.

We find no error in the refusal of the court to allow testimony as to the practice of the immigration office, and as to its recommendations touching further legislation. Departmental construction is of value only in construing ambiguous provisions of statute, but we find no ambiguity in section 18. Nor do we find merit in the contention that the testimony was insufficient to support the verdict. In the case of an alien who had been a permanent member of the crew for years, proud it may be of his ship, and loyal to her flag, careful never to abuse any privilege of shore leave, it might be sufficient to let him go and come as he pleased while the ship was in port; but the same latitude in the case of an unknown alien of some other nationality than the ship, who was no sailorman, but merely a scullion or a waiter, might well be found to constitute a failure to adopt due precautions. The question was properly submitted to the jury under a charge which carefully instructed them in all essential points and which was not excepted to. There was no error in refusing a request to instruct them further that they might consider whether refusal of shore leave would tend to increase or diminish desertions. That was not the question for them to decide. They were substantially instructed that they could

not convict, unless they found that there was precautions which a reasonable man would have adopted, but which the captain failed to take. The last request made on behalf of defendant (they are not numbered) merely stated this proposition in another form.

Upon cross-examination the defendant was asked whether during the trip of the Slavonia then under consideration, and during her stay in New York October 10th to October 17th, 22 other alien seamen besides Ramadonawitch did not desert the ship. Counsel objected to this as immaterial, and because an answer would require defendant to incriminate himself as to other crimes. Objection was overruled, and exception reserved. The question of privilege is not before this court, since the witness did not stand on his privilege, but answered the question. Morgan v. Halberstadt, 60 Fed. 592, 9 C. C. A. 147. The testimony was clearly relevant to the main issue in the cause, namely, whether during the stay of the Slavonia in this port Capt. Taylor was adopting due precautions to prevent the landing of aliens from his ship. Information as to all the circumstances would certainly be helpful towards a conclusion, and there is no provision of law which would require the exclusion of such testimony on the theory that it tended to show the commission of other offenses against the same statute. Packer v. U. S., 106 Fed. 906, 46 C. C. A. 35.

The judgment is affirmed.

WALLACE, Circuit Judge. I dissent from the judgment of the court. I think the statutory provision under which the defendant was indicted is not to be construed as embracing sailors who are bona fide members of a ship's crew. It is true the section penalizes the landing of "any alien," and the term, read without reference to the context, or the history of the legislation of which it is a part, or the well-known objects of this legislation, is broad enough to include a sailor. It is also broad enough to include the ambassador of a foreign government to our own, who comes here by vessel to enter upon the duties of his post.

The act of March 3, 1903, is a collocation and revision of several pre-existing laws of Congress, some of which relate to the exclusion from the United States of objectionable immigrants, and others, to the importation of aliens who were under contract to perform labor or services. It is entitled "An act to regulate the immigration of aliens into the United States." In the earlier acts those relating to the exclusion of objectionable immigrants usually employed the term "alien immigrants." In those relating to the importation of contract laborers the term "foreigners" or "aliens" was used, possibly because such laborers might come either as immigrants—that is, with the purpose of acquiring a permanent residence here—or they might come as temporary sojourners, remaining only to perform the particular engagement which they had entered into; and the term "foreigners" or "aliens" was sufficiently broad to include both classes. In the revision of 1903 the short and comprehensive term "aliens" was used throughout, as well in the provisions particularly relating to immigrants, as in those relating to contract laborers. In codifications and revisions changes of phraseology for the sake of brevity or consistency are frequently

made, and should not be construed as intended to make a radical change in the previous laws, unless the language plainly contemplates the intention to make such a change. Taylor v. Delancey, 2 King's Cases, 143, 151; Chancellor Kent, in Goodell v. Jackson, 20 John. (N. Y.) 693, 11 Am. Dec. 351; United States v. Dauphin (C. C.) 20 Fed. 625.

There are two provisions, and only two, in the act of 1903, making it a misdemeanor for the master of a vessel to land aliens. One of these is section 8. This provision originated in section 4 of the act of February 28, 1885, to prohibit the importation of contract laborers, and made it a misdemeanor to knowingly land or permit to be landed "any alien laborer, mechanic or artisan" who previous to his embarkation was under contract. Section 4 was re-enacted in the act of March 3, 1891 (section 6), in somewhat different language, whereby it was made a misdemeanor to bring into or land in the United States "any alien not lawfully entitled to enter." That act enumerated the aliens who were not entitled to enter as belonging to two classes only, immigrants or contract laborers. Obviously section 8 of the present act is merely a reproduction of the former laws, which apply only to these two classes of aliens. The other provision (section 18), under which the plaintiff in error was indicted, is less comprehensive than section 8. The misdemeanor thereby created consists in permitting to land without due precautions to prevent it, "any such alien from such vessel," as is mentioned in the previous sections of the act and particularly in section 13. Section 13 provides that all aliens arriving by water shall be listed in convenient groups, and each list be verified by the oath of the master of the vessel that he believes:

"That no one of said aliens is an idiot, or insane person, or pauper, or likely to become a public charge, or is suffering from a loathsome or dangerous contagious disease, or is a person who has been convicted of felony or other crime involving turpitude, or a polygamist, or an anarchist, or not under promise, express or implied, to perform labor in the United States, or a prostitute."

The offense consists in landing or permitting to land any alien "at any place other than that designated by the immigration officers." Section 16 makes it the duty of the immigration officers to inspect all such aliens as are mentioned in section 13, and empowers them to "order a temporary removal of such aliens for examination at a designated time and place," and this is the only provision of the act authorizing the designation of any "time or place" by the immigration officers.

Section 18 is a part of section 8 of the act of 1891, which only applied to aliens who are immigrants, but as it uses the term "any aliens," instead of the term "any alien immigrant," it should be construed as applicable not only to alien immigrants, but to all aliens of the previously enumerated classes. Even if it were not by its terms applicable only to "such aliens," those mentioned in the preceding sections, it would be by implication, because it is to be read with all the provisions of the act in pari materia. This is not only a general rule of statutory interpretation, but it is one which is especially applicable to a general code or statutory revision. As to these the rule of construction is that the enactment is intended to form one system of statutory laws contemporaneous in time, and all the sections dealing with the same subject-matter are to be construed as one statute. The accepted canons

of interpretation of all statutes require every part of the act to be taken into view for the purpose of ascertaining the legislative intent; restrict general expressions whenever necessary to make all the parts harmonize and give an intelligible effect to each; and limit the application of general terms so as not to lead to injustice or an absurd conclusion. U. S. v. Terra Cotta Vases (C. C.) 18 Fed. 508; Case of Chinese Merchant, 13 Fed. 605; Carlisle v. U. S., 16 Wall. 153, 21 L. Ed. 426.

Section 2 is devoted to a preliminary enumeration of the classes of aliens who "shall be excluded from admission into the United States." This enumeration is somewhat more in detail than that contemplated by the provisions of section 13, but does not necessarily include any aliens who do not come intending to reside in the United States, and does not mention sailors. There is not a provision in the act which indicates any intention to embrace sailors in the classes of aliens to be excluded, otherwise than by the mere use of the term "aliens." Many of the provisions in which the classes are referred to by this comprehensive term are such as would be absurd, if they were intended to apply to sailors. Section 13 is an illustration, and it can hardly be seriously argued that here Congress intended to require the master of the vessel to give each seaman a ticket to identify himself and his family, and then to require the master to swear that he believes that no one of his sailors is an idiot or a prostitute.

These considerations would suffice to lead to the conclusion that section 18 does not by reasonable construction include sailors under the general term "any aliens"; but they are reinforced because at the time of the enactment it was perfectly well understood that the alien exclusion laws did not apply to sailors. This had been so decided in United States v. Sandrey (C. C.) 48 Fed. 550, and in United States v. Burke (C. C.) 99 Fed. 895.

In the latter of these cases the court said:

"These statutes do not contemplate the exclusion of crews of vessels which lawfully trade in our ports, and they do not, in spirit or in letter, apply to seamen engaged in either calling, whose home is on the sea, who are here to-day and gone to-morrow, who come on a vessel into the United States with no purpose to reside therein, but with the intention when they come of leaving again on that or some other vessel, for the port of shipment or some other foreign port in the course of her trade. To hold that these statutes apply to aliens comprising the bona fide crews of vessels engaged in commerce between the United States and foreign countries would lead to great injustice to such vessels, oppression to their crews, and serious injuries to commerce."

The Attorney General of the United States had formulated an opinion on the subject to the same effect, and had so advised that department of the government charged with the administration of the alien exclusion laws. He said:

"That, although it was true that Congress had not excepted them (seamen) from the express language of these statutes, in the practical administration of these laws they have always been excepted, and their inclusion in the class of alien immigrants would lead to consequences so destructive to legitimate commerce, that such inclusion could fairly be regarded as beyond the intention of Congress." 23 Op. Atty. Gen. 521.

In view of the decisions of the federal courts whenever the question had been presented, the opinion of the chief law officer of the govern-

ment, and the construction which had been placed upon the pre-existing legislation by the administrative officers of the government, the circumstances that in the revision no change was made specifically enlarging the class of prohibited aliens so as to include sailors, is significant that Congress had no intention of including them.

The majority opinion adopts a construction of the statute which has not hitherto been supposed possible by the head of the Immigration Bureau. In his last official report, that of 1895, the Commissioner General of Immigration recommends that legislation should be adopted "to check violations of the immigration laws by professed seamen, and imposing a penalty upon masters for signing other than bona fide seamen upon their crew lists."

The majority opinion, in order to obviate the hardship and inconvenience which would result if alien seamen are included in the statute, attempts to mitigate these consequences by giving a more liberal interpretation to the term "landing" than is permitted by the language of the section. The opinion virtuallly declares that, if seamen are allowed to go ashore under such rules, discipline, and restraint as would tend to bring them back to the ship, they are not "landed," within the meaning of the section. According to the accepted meaning, the act of landing is "setting on shore; coming on shore." Giving the language of the section its ordinary meaning, it is none the less an offense to land a sailor that he has been landed under precautions which will insure his return to the ship. If sailors are included in the statute, it seems plain that they cannot be permitted to go ashore by the officers or the owner of a vessel, and any failure to take sufficient precautions in that behalf is a violation of the section. I cannot agree to such a latitudinarian construction of the statute for the purpose of eliminating its objectionable features and fortifying the argument that Congress intended to include sailors.

Congress either intended to include sailors under the general term of aliens, or it did not. The majority opinion is based merely on the employment by Congress of the broad term. If Congress by the use of this term intended to include sailors, it intended to include the officers of the ship; and the commanders of nearly all the foreign steamships, as well as the officers of foreign naval vessels upon a visit here, would be included in the term.

I think the conviction of the plaintiff in error proceeded upon a wrong interpretation of the statute, and that it should therefore be reversed.